J. & A. Blumenthal *v.* Brainerd et al.

---

## J. & A. BLUMENTHAL *v.* LAWRENCE BRAINERD, JOSEPH CLARK AND JOHN GREGORY SMITH.[*]

*Common Carriers. Warehousemen. Notice. Damages. Railroad. Agency. Chancery.*

The defendants being common carriers over a certain line of railroad, it can be no defence to an action at law, for a breach of a duty or obligation arising out of business entrusted to them in that relation, that they were running and managing the line of railroad as receivers under an appointment of the court of chancery.

The court correctly instructed the jury as to the effect that they should give to the bill of goods made out to Rosenberg as the purchaser.

Where the defendants, who were common carriers, had printed upon their bills of freight tariff and their receipts, a notice "that all goods and merchandise will be at the risk of the owners while in the storehouses of the company," it was *held*, that, in the absence of proof that the owners of goods delivered to the defendants for carriage, assented to this notice as qualifying or affecting the defendants' duties or obligations as common carriers in respect to said goods, such notice would have no effect to prevent the defendants from being liable for a loss of the goods, if the facts in other respects were such as to make them liable, though the owners had knowledge of such notice when the goods were delivered to the defendants.

If such notice could limit the carrier's liability, knowledge of it in other transactions by an agent of the owners of the goods, in this transaction, would not affect the principals. A notice to an agent in order to bind the principal, must be in the same transaction.

The principle recognized that the general liability of a common carrier can be restricted or diminished by an express or special contract; but a general notice by a carrier to the public, limiting his obligations as a common carrier, has been held by this court to afford no evidence of such contract, even if the existence and contents of the notice were brought home to the party.

The principle also recognized that the liability of the carrier may be limited by the terms of a general notice, when those terms are reasonable and just, and are brought home to the knowledge of the owner of the goods; but such notice is not effectual to exempt a carrier from liability for negligence, even though it should be considered as effectual to limit the time after the arrival of the goods at their place of destination in which the carrier would continue in the relation of common carrier.

The question when the transit is terminated, so that the duty and responsibility of the carrier as such is ended, is ordinarily one of fact, resting altogether in proof, to be determined by the jury, with reference to the mode of transportation, the terms of the contract, the ordinary and reasonable course of business at the place of destination, and other attending circumstances.

In the absence of a special contract varying his liability, a common carrier stands in the situation of an insurer of the property entrusted to him, and is answera-

---

[*] This case was argued at the January Term, 1865, before BARRETT, KELLOGG and PECK, Judges.

J. & A. Blumenthal *v.* Brainerd et al.

ble for every loss or damage happening to it while in his custody as such carrier, by whatever cause occasioned, unless it were by the act of God, or of public enemies. And the duty assumed by him on a line of railway, is to carry the goods safely to the place of destination, and there discharge them on the platform, or other suitable place, so as to put them in readiness for convenient delivery to the consignee or party entitled to them.

The responsibility of the carrier for the goods, as a common carrier, continues after their arrival at the place of destination, until they are ready to be delivered at the usual place of delivery and the owner or consignee has had a reasonable opportunity, during the hours when such goods are usually delivered there, of examining them, so far as to judge from their outward appearance of their identity and whether they are in a proper condition, and to take them away; and it is the duty of the owner, or consignee, under the contract of carriage, to take notice of the course of business at the station of delivery, and of the time of the arrival of the train when his goods may be expected at the place of delivery, and to be ready to rec ive them in a reasonable time after their arrival, and when in the common course of business they may fairly be expected to be ready for delivery.

But if the goods are not called for by the party entitled to receive them, after they are ready for delivery, &c., it then becomes the duty of the carrier to store them and preserve them safely and in readiness for delivery, and then the carrier is released from his responsibility as a common carrier for the goods, and becomes liable for them as a warehouseman.

In the relation of a warehouseman a party is bound only to use ordinary care and diligence in keeping the goods safely.

The situation of the consignee of goods entrusted to a common carrier, and the distance of his place of business from the place of their destination, are not matters which have any proper bearing on, or connection with, the duty of the carrier in respect to the goods as common carrier.

A box of goods was started from New York for St. Albans on the 13th of September, and the plaintiff claimed that on the evening of the 17th the consignee called at the depot at St. Albans and found the box ready for him, but left it with a view of calling for it the next morning, but during the night the box was stolen. *Held,* that the defendants' duty as common carriers in respect to the box was fully performed, and the contract of carriage is to be treated as ended, unless it was reasonable under all the circumstances of the case, that the party entitled to receive the box should not be called upon to accept a delivery of it until next morning.

If the box remained in the depot in readiness for delivery for seven days after its arrival there, as the defendants' evidence tended to prove, and was stolen on the night of the 24th of September, and not on the night of the 17th as the plaintiffs claimed, it is *held,* that a reasonable time had been afforded to the party entitled to receive the box to call for it and accept a delivery of it, and that the defendants' responsibility for the goods as common carrier ceased before the box was stolen.

The case of *Ouimit* v. *Henshaw & Thacher,* 35 Vt. 605, referred to and explained.

The rule of damages in case of the loss of goods by a common carrier, is their value at the place of destination, at the time of the loss, with interest from that

time, deducting freight where it has not been paid. But where the only evidence of the value was the price stated in the bill where the goods were purchased, it was *held*, that the jury should have been limited to that price in assessing the damages, with interest from the time of loss to time of trial.

Upon the evidence in this case it is *held*, that the plaintiffs were the sole owners of the goods lost.

THIS was an action of assumpsit in three special counts, two charging the defendants as common carriers and one as warehouse-men, and the general counts. Plea, the general issue, and trial by jury, April Term, 1864, PIERPOINT, J., presiding.

The plaintiffs claimed that one I. Rosenberg, a German pedlar, residing in the town of Franklin, went to New York city in the month of September, 1860, and purchased in the name of the plaintiffs and by their direction a bill of goods, of Ullman, Blumenthal & Co., the amount and cost of which on the 13th day of September, 1860, on a credit of six months, was $490.69, as stated in the bill annexed to the deposition of J. Strauss, salesman of said Ullman, Blumenthal & Co. ; that these goods were to be sold by Rosenberg, and he was to have all he could get for them over the cost, as above stated, and the cost was to be paid over to the plaintiffs ; and until sold by Rosenberg the goods were to be the property of the plaintiffs ; that Rosenberg caused these goods to be boxed, and marked in large letters on the box as follows : " I. Rosenberg, St. Albans Depot," and had them sent to the New Haven Railroad depot in the city of New York.

The evidence of both the plaintiffs and defendants in respect to the time when the goods arrived at St. Albans, and how long held by the defendants before stolen, &c., is stated in the opinion. The plaintiffs introduced proof that the defendants were common carriers. The court refused to allow the defendants to ask the plaintiffs' witness upon this point whether he had not always understood that the defendants were managing the Vermont and Canada and Vermont Central Railroads, as receivers, appointed by the court of chancery.

The defendants offered in evidence a certified copy of a decretal order of the court of chancery, within and for the county of Franklin, made at the April Term, 1860, which was not objected to, directing that said railroads should remain in the hands of the defendants in this case as receivers, and it was conceded that the defend-

ants were managing said railroads by virtue of that order, and as trustees of the latter road, at the time the plaintiffs claim these goods were lost. The defendants also gave in evidence a duplicate bill made for Rosenberg to sign when he should receive the box, with evidence tending to prove that Rosenberg has seen and signed similar ones—containing the words printed on the margin as follows: "Terms cash on delivery. All goods and merchandise will be at the risk of the owners while in the storehouses of the company," and that it was the uniform custom of the defendants to give such receipts, and that they made no charges for storage of goods, that the storehouse was for the convenience of the owners of goods.

The defendants also gave in evidence a printed bill of freight tariff, and rules and regulations concerning the same, with evidence tending to prove that the same were posted up at all the depots and stations on the line of the road, and of connecting roads, and the defendants regulated their business in conformity thereto. Extracts from rules and regulations as to freight: "All articles of freight arriving at their place of destination, must be taken away within forty-eight hours after being unladen from the cars,—the company reserving right of charging storage on the same, or placing the same in store at the risk and expense of the owner, as they see fit, after the lapse of that time."

The defendants offered in evidence a bill containing the same items as the one annexed to the deposition of one Sigmund P. Sternau, book keeper of said Ullman, Blumenthal & Co., but made out to Rosenberg, with evidence as follows: J. W. Hobart, a witness for the defendants, testified among other things, that he was freight agent of the Vermont and Canada Railroad. "The bill of goods now shown me (being the bill in question) I think was handed me by Rosenberg." On cross-examination he said: "Rosenberg gave me the bill I think, and I think so because he called for the box. I do not recollect that Rosenberg handed it to me,"—and claimed the right to go to the jury on the question whether the bill was not in the same hand writing as the one in the deposition, said Rosenberg having testified that he did not buy the goods for himself, or obtain such a bill. The plaintiffs objected to the introduction of this bill, and the court admitted it for the sole purpose of impeaching the tes-

timony of Sternau, and declining to allow it to be used for any other purpose whatever.    The defendants claimed that it was evidence to impeach Rosenberg, and to show that he in fact bought the goods. The deposition of Sigmund P. Sternau stated in substance that he as book-keeper of Ullman, Blumenthal & Co., on the 13th of September, 1860, entered a bill of goods on the books of Ullman, Blumenthal & Co., sold by Jacob Strauss, a salesman in said mercantile house, to I. Rosenberg; that since that time he had made out a copy of those entries; that on the day of the sale he made one copy; that the first bill below is a true copy of those entries, and was made by him from the books, the items of goods being omitted in the annexed bill.

Bill of same goods made out to Rosenberg, and annexed to the deposition of Sternau:

NEW YORK, Sept. 13th, 1860.

Messrs. J. & A. Blumenthal, for I. Rosenberg,

Bought of Ullman, Blumenthal & Co.

Jobbers and Dealers in Fancy and Domestic Dry Goods, Hosiery, &c.

Terms.                        No. 364 Broadway, corner of Franklin St.

The amount of said bill was $490.69.

Bill to Rosenberg, testified to by Hobart, and offered in evidence by the defendants:

☞ All claims to be made within ten days of the receipt of goods.

NEW YORK, Sept. 12th, 1860.

Mr. Rosenberg

Bought of Ullman, Blumenthal & Co.

Jobbers and dealers in Fancy and Domestic Dry Goods.

No. 24 Dey Street.

Terms cash.

The plaintiffs gave no evidence as to the value or price of the goods, other than is contained in the deposition and bills annexed. And the plaintiffs did not claim that the defendants made any special contract to receive the goods at the depot at St. Albans, or had any personal knowledge of the same, but claimed that the defendants were liable as common carriers or as warehousemen, having taken into the depot the box carried by them.

The defendants made numerous requests to the court to rule and charge the jury, but their principal claims are stated in the opinion of the court, together with the charge of the court in respect thereto, except upon one point. The court told the jury as follows : that the bill of goods put into the case by the defendants could be used by them only for the purpose of impeaching the deposition of Sternau, and could not be considered for any other purpose.

The defendants excepted to the charge as given on the points embraced in the requests, and to the refusal to charge and rule as requested. Verdict for the plaintiffs for the sum of $608.25 damages.

After verdict and before judgment the defendants filed a motion in arrest of judgment, which the court, *pro forma*, overruled, and the defendants excepted.

*Levi Underwood*, for the defendants.

*H. B. Smith* and *E. J. Phelps*, for the plaintiffs.

The opinion of the court was delivered by

KELLOGG, J. The defendants' exceptions in this case present several questions for consideration, some of which are not now insisted on, and these have been treated as laid out of the case.

I.  The defendants claim that they were operating the Vermont Central and Vermont and Canada Railroads as receivers under the appointment of the court of chancery, and that, being the agents and officers of that court under this appointment, they were subject to account only in that court, and were entitled to its protection and judgment in all matters growing out of the performance of their duties as such receivers, and therefore could not be made liable either as common carriers or warehousemen in this action. A court of chancery will protect a person acting under its process or authority, in the execution of a decree or decretal order, against suits at law ; and will compel parties to apply to that court for relief. This protection is accorded by that court to its officers only on their own application, and is granted by the chancellor in the exercise of his discretion, and it is to be presumed that it would be granted in any necessary or proper case for such relief. 2 Story's Eq. Jurisp., (Redfield's edit.,) §§ 833, *a*, 833, *b*, 891 ; 2 Daniell's Chancery Pr., (Perkins' 3d Amer. edit.,) 1433. But we think that the mere fact

that the defendants were acting as receivers under the appointment of the court of chancery cannot be recognized as a defence to a suit at law for a breach of any obligation or duty which was fairly and voluntarily assumed by them in matters of business conducted or carried on by them while acting as such receivers. As between a receiver and the parties interested in the trust, the receiver would be responsible for negligence; but he might be liable to other parties in a larger or stricter degree of responsibility. The assumption by the defendants of the peculiar duties and extraordinary responsibilities arising from the relation of common carriers is not to be considered as necessarily, if at all, incompatible with any duty or responsibility imposed upon them as receivers. The plaintiffs' evidence tended to show that the defendants were managing and controlling a long line of railroad and conducted and held themselves out as common carriers over that line. If in fact they were common carriers over that line of railroad, we think that it is no defence to an action at law, for a breach of a duty or obligation arising out of business entrusted to them in that relation, that they were running and managing the line of railroad as receivers under an appointment of the court of chancery. *Sprague* v. *Smith*, 29 Vt. 421.

II. The defendants claim that the alleged duplicate bill of the goods made out in the name of Rosenberg as the purchaser, which was referred to in the testimony of Hobart, should have been received as evidence by the county court for the purpose of impeaching Rosenberg, and also as evidence on the question as to whom the goods were in fact sold by Ullman, Blumenthal & Co.,—whether to the plaintiffs or Rosenberg. This bill was introduced by the defendants, and received, as evidence tending to impeach Sternau, the book-keeper of Ullman, Blumenthal & Co., by whom the sale of the goods was entered at the time it was made, and whose deposition had been introduced and read as evidence by the plaintiffs,—the defendants claiming that the bill was in the same hand writing with a bill of the same goods annexed to the deposition of Sternau which was made out in the name of the plaintiffs, " for I. Rosenberg," as the purchasers; and Rosenberg had testified he did not buy the goods for himself, nor obtain such a bill. Hobart, on his direct examination testified that he thought that this bill was delivered to him by

Rosenberg, but, on cross examination, he testified that he thought that Rosenberg gave the bill to him " because he called for the box," but that he did not recollect that Rosenberg delivered it to him. Aside from this testimony of Hobart, there was no testimony tending to connect Rosenberg with the bill or to show that it was ever in his possession. Perhaps there might be a strong probability that Rosenberg gave this bill to Hobart, but this is wholly a matter of inference by reasoning on the part of Hobart on a subject in respect to which he admits that he has no recollection. His reasoning may have been right, but possibly it might have been wrong; and, at the best, it was really nothing more than a conjecture on his part. For the purpose of impeaching Rosenberg, the evidence was exceedingly inferential and remote, and was too slight in its bearing to merit any serious consideration. There was no evidence tending to show that this bill was in fact made at the time of the sale; and we think that the county court gave all the effect to it which it was entitled to have.

III. The defendants object to the charge of the court to the jury on several distinct grounds.

1. It is claimed that the charge was wrong in respect to the notice contained in the defendants' freight tariff with the accompanying rules and regulations, and also in the margin of the duplicate receipt prepared to be signed by Rosenberg as the consignee, "*that all goods and merchandise will be at the risk of the owners while in the storehouses of the company.*" The court charged the jury that these notices would have no effect to prevent the defendants from being liable for a loss of the goods if the jury found the facts in other respects such as to make them liable. A notice to the principals in another transaction would be good in this, but a notice to the agent in order to bind the principals must be in the same transaction,—the principal and agent, so far as the same transaction is concerned, being regarded for purposes of notice as identical. Redfield on Railways, § 133, note 7; Dunlap's Paley's Agency, 262–3, note; 1 Story's Eq. Jurisp., (Redfield's edit.,) § 408. We recognize the principle that the general liability of a common carrier can be restricted or diminished by an express or special contract; but a general notice by a carrier to the public, limiting his obligations as a common carrier,

27

has been held by this court to afford no evidence of such contract, even if the existence and contents of the notice were brought home to the party. *Kimball* v. *Rut. & Bur. Railroad Co.*, 26 Vt. 247; Redfield on Railways, § 132, note 3. We also recognize the principle that the liability of the carrier may be limited by the terms of a general notice, when those terms are reasonable and just, and are brought home to the knowledge of the owner of the goods, before or at the time of the delivery to the carrier, and are assented to by the owner. In such a case, such notice and assent thereto would be equivalent to an express contract between the parties to the same effect. But we think that such notices are not effectual to exempt a carrier from liability for negligence, even though they should be considered as effectual to limit the time after the arrival of the goods at their place of destination in which the carrier would continue in the relation of a common carrier. Redfield on Railways, § 133; *Sager* v. *P. S. & P. Railway*, 31 Maine, 228; Angell on Carriers, §§ 267, 268, 275. If the evidence on the trial had tended to show that these notices were in fact given to the plaintiffs personally, before or at the time when the goods were received for carriage, we should regard the instructions to the jury in respect to the effect of the notices as being subject to exception, because not limited or confined to the case of a loss of the goods arising from the defendants' misconduct or negligence. There was no evidence tending to show that the plaintiffs ever saw or heard of these notices, and even if they should be considered as affected by the knowledge which Rosenberg had in respect to the terms and effect of the notices, acquired in his own previous business transactions with the defendants, still there is no evidence tending to show that they or he assented to these notices as qualifying or affecting the defendants' duties or obligations as common carriers in respect to these goods. We think, therefore, that these notices were properly treated by the court as mere nullities, and that there was no error in the instructions to the jury on this point, as applied to the evidence in the case.

2. The important question in this case is in respect to the termination of the transit of the goods, or to the length of time in which the defendants' relation and responsibility as common carriers continued. In the absence of a special contract varying his liability, a

common carrier stands in the situation of an insurer of the property entrusted to him, and is answerable for every loss or damage happening to it while in his custody as such carrier, by whatever cause occasioned, unless it were by the act of God, such as a tempest, or by the act of public enemies. Thus, though he may be entirely faultless, he is liable for damage done by an accidental fire or by a robbery,—"a promise to carry safely being a promise to keep safely." *Dale* v. *Hall*, 1 Wils. 281; Angell on Carriers, § 67. The box containing the goods in this case was marked "*I. Rosenberg, St. Albans depot.*" The evidence of the plaintiff tended to show that the box was delivered in New York, at the depot of the New Haven Railroad Company, for transportation, on the 13th September, 1860, and that it was seen in the depot of the defendants' railroad at St. Albans in the evening of the 17th September, four days afterwards; and that it was missing on the morning of the next following day, (18th September,) having been stolen from the depot in the night before, and that one of the doors of the depot was found unfastened on that morning, and that, on the same morning, the box was found under the depot, broken open, and the goods scattered around, and many of them gone. The plaintiffs' evidence also tended to prove that Rosenberg, who resided in the town of Franklin, wrote from New York a letter to one Fish, of Franklin, informing him of the forwarding of the box, and asking him to send to St. Albans for it, and that, in the evening of the 17th of September, one Alger of Franklin, at the request of Fish, called at the depot at St. Albans for the box, and saw it in the depot, and intended to take it away on his return to Franklin, but that the box was missing the next morning, as above stated. The evidence for the defendants tended to show that the box arrived at the depot at St. Albans on the 17th of September, and was put into the depot and remained there, and that no one called for it, and that in the night of the 24th of September, seven days after its arrival, it was stolen by some person unknown, and that it was found on the next morning (25th of September,) broken open as claimed by the plaintiffs, and that the time when it was found was the 25th of September instead of the 18th. The defendants, among other things, requested the court to charge the jury that if the box remained in the depot from the 17th to the 24th of Sep-

tember, as their evidence tended to show, they were not liable as
common carriers for the loss of the box ; and that if Alger went to
the depot for the box, by the authority of Rosenberg, and saw it,
and did not take it away, they could not be held liable as common
carriers for the loss of the box after that, and especially if it had
already laid in the depot for seven days as their evidence tended to
show.   The jury were instructed, among other things, "that if they
found that the defendants were common carriers, and received the
box to carry, and it belonged to the plaintiffs, and was lost by the
defendants while they had the custody of it as such carriers, the de-
fendants were liable for the loss, whether they were guilty of negli-
gence or not, and that their liability as such carriers was not termi-
nated when the box was put into the depot at St. Albans, but contin-
ued until such time as Rosenberg, the consignee, could have a
reasonable time—he using all reasonable diligence and despatch—to
ascertain its arrival and to take it away, and that was purely a ques-
tion for the jury in view of all the circumstances of the case,—such
as the situation of the party to whom sent, the distance, of his place
of business from the depot, the ordinary course of business on the
road with reference to despatch, or the regularity of the arrival of
freight when sent from a distance, the nature of the property, quan-
tity, weight, &c., with reference to facility of its removal, &c. ; that
if the box was put into the depot on the 17th of September, and was
taken the same night, the jury might think, under all the circum-
stances of the case, that Rosenberg had not had a reasonable time
to take it away, and that if it remained there until the 24th of Sep-
tember, as the defendants claimed, the jury might think that a rea-
sonable time had elapsed, and that the court could not say in this
case as a matter of law that a reasonable time had or had not elapsed
to take the box away, and that it was for the jury to say, under all
the circumstances, whether that was a reasonable time or not ; and
that if a reasonable time for Rosenberg to get the box away had
elapsed before the box was stolen, then the defendants would not be
liable under the counts charging them as common carriers."   The
question when the transit is terminated, so that the duty and re-
sponsibility of the carrier as such is ended, is ordinarily one of fact,
resting altogether in proof, to be determined by the jury with refer-

ence to the mode of transportation, the terms of the contract, the ordinary and reasonable course of business at the place of destination, and other attending circumstances. In this case, there was no evidence to show that the duty of the defendants as common carriers on a line of railway was altered or affected by any special contract, and the case stood on the general duty of such carriers. The law of the subject received very full and careful consideration in the case of the *Farmers & Mechanics' Bank* v. *Champlain Transportation Company*, 23 Vt. 186, and also in the cases of *Thomas* v. *Boston & Providence Railroad*, 10 Met. 472 ; *Norway Plains Company* v. *Boston & Maine Railroad*, 1 Gray, 263, and *Moses* v. *Boston & Maine Railroad*, 32 N. H. 523, and has been discussed in many other adjudged cases ; and it is not now necessary to review in detail the principles which regulate and govern the rights and duties of such carriers. In the usual business of transportation on railways, goods are delivered and received at stations, freight houses or warehouses, or other particular places of deposit ; and all the adjudged cases agree that, in the absence of a special contract, the duty assumed by a common carrier on a line of railway is to carry the goods safely to the place of destination, and there discharge them on the platform, or other suitable place, so as to put them in readiness for convenient delivery, to the consignee or party entitled to receive them. It seems also to have been settled that the carrier is neither bound to deliver to the consignee personally, nor to give notice to him of the arrival of the goods. Redfield on Railways, § 130, pl. 4 ; *Norway Plains Company* v. *Boston & Maine Railroad*, 1 Gray, 263. We think that the responsibility of the carrier for the goods, as a common carrier, continues after their arrival at the place of destination, until they are ready to be delivered at the usual place of delivery and the owner or consignee has had a reasonable opportunity, during the hours when such goods are usually delivered there, of examining them, so far as to judge from their outward appearance of their identity and whether they are in a proper condition, and to take them away ; and that it is the duty of the owner or consignee, under the contract of carriage, to take notice of the course of business at the station of delivery, and of the time of the arrival of the train, when his goods may be expected at the place of delivery, and to be ready to receive them in

a reasonable time after their arrival, and when in the common course of business they may fairly be expected to be ready for delivery. This is the doctrine of the case of *Moses* v. *Boston & Maine Railroad,* 32 N. H. 523,—a case very maturely considered,—and is the rule approved by Chief Justice REDFIELD in his treatise on the Law of Railways, (Redfield on Railways, § 130, pl. 7, 8, 9,) and it appears to us to be entirely just and equitable, and to be founded in the reason, analogies, and established principles of the law of common carriers. We are aware that this rule is in conflict with the rule adopted in the case of *Norway Plains Company* v. *Boston & Maine Railroad,* 1 Gray, 263, that " delivery from the cars into the depot terminates the transit," whether done in the day-time or in the night, in or out of the usual business hours, irrespective of the question whether the owner or consignee has or not a reasonable opportunity to remove the goods, and even though he has no such opportunity ;— but we regard that case, in respect to this point, as being justly liable to the criticism which was made upon it in the case of *Moses* v. *Boston & Maine Railroad, ubi supra,* and which it also received from Chief Justice REDFIELD in his treatise on the Law of Railways. (See Redfield on Railways, § 130, pl. 6, note 9, and pl. 9.) After the goods are ready for delivery, and the owner or consignee has had a reasonable opportunity, during the hours when such goods are usually delivered, to examine them and remove them, it then becomes the duty of the carrier, if the goods are not called for by the party entitled to receive them, to store them and preserve them safely and in readiness for delivery when duly called for by such party, and then the carrier is released from his responsibility as a common carrier for the goods, and becomes liable for them as a warehouseman. In the relation of a warehouseman he is bound only to use ordinary care and diligence in keeping the goods safely,—a greatly diminished degree of responsibility. It appeared from the evidence of both parties in this case that the box containing the goods arrived at the depot at St. Albans on the 17th of September, 1860, and, from the plaintiffs' evidence it also appeared that Alger went to the depot for the box, under the authority of Rosenberg, and called for it, and saw it there, in the evening of that day, and intended to take it away on his return to Franklin, but did not then take it. Applying the prin-

ciples which we have stated to these facts, we think that the jury should have been instructed that the defendants' duty as common carriers in respect to this box of goods was fully performed, and the contract of carriage was to be treated as ended, if the box was in readiness for delivery when it was called for by Alger, unless it was reasonable, under all of the circumstances of the case, that the party entitled to receive the box should not be called upon to accept a delivery of it until the next morning. But the defendants' evidence tended to prove that the box remained in the depot, in readiness for delivery, for seven days after its arrival there, and was stolen in the night of the 24th of September, and not in the night of the 17th of September, as claimed by the plaintiffs; and we think that the jury should have been instructed that if this evidence for the defendants was believed, a reasonable time had been afforded to the party entitled to receive the box to call for it and accept a delivery of it, and that the defendants' responsibility for the goods as common carriers ceased, before the box was stolen. The situation of the consignee, and the distance of his place of business from the depot, were matters which, as we think, had no proper bearing on, or connection with, the duty of the defendants in respect to the box as common carriers, and we regard the charge given to the jury as erroneous, so far as it suggested these matters as entitled to consideration in determining the question whether Rosenberg had a reasonable time—he using all reasonable diligence and despatch,—to ascertain the arrival of the box, and to take it away. These were matters which might affect the consignee's convenience, but could not affect the defendants' duty as carriers. In the case of *Moses* v. *Boston & Maine Railroad*, 32 N. H. 523, above referred to, it was held that the reasonable opportunity to which the consignee is entitled, for the purpose of examining the goods and taking them away after their arrival at the place of destination, is not to have reference to the peculiar situation and circumstances of the consignee, but is to be such as would give to a person residing in the vicinity of the place of delivery, and informed of the usual course of business on the part of the servants of the company in unloading the cars and delivering out goods of that character, and also informed of the time when the goods may be expected to arrive, suitable opportunity, within the

usual business hours for delivering such goods, after they had been placed in readiness for such delivery, to come to the place of delivery, inspect the goods, and take them away ; and we think that this is the true legal rule on the subject.

The recent case of *Ouimit* v. *Henshaw* & *Thacher*, 35 Vt. 605, has been referred to by both parties in this case as supporting their respective claims in respect to the extent and termination of the defendants' liability as common carriers, and the commencement and nature of their liability as warehousemen.  As this is the first instance in which the decision in that case has been referred to in this court since it was made, and as I was the presiding judge on the trial of the case in the county court, I consider this an appropriate occasion to call attention to certain facts which are entitled, as I think, to be taken into account in determining the weight which the decision should have, and how far it should be regarded as binding authority.  The case is a palpable illustration of the fact that questions are sometimes successfully raised in this court which were not made on the trial in the county court.  It was argued in this court in Bennington county at February Term, 1861, and decided at February Term, 1863.  I have carefully collated the bill of exceptions allowed on the trial with the statement of facts contained in the reported case, and find that the case as presented by the bill of exceptions is very fully and accurately stated in the report ; and I accordingly refer to the reporter's statement of the case as verifying the statements which I now make.  Exceptions were taken by the defendants on the trial in the county court, on three points :  1, to the refusal of the court to rule that the evidence on the part of the plaintiff was not sufficient, *prima facie*, to establish a cause of action against the defendants under the declaration ;  2, to the refusal of the court to charge the jury that articles of furniture, or such articles as feather beds and bedding, could not be treated as baggage ; and 3, to the charge of the court in respect to certain specified particulars,—those particulars being distinctly stated in the bill of exceptions as forming only a part of the charge which was given to the jury.  In the opinion delivered in the case, the first subject of exception is not alluded to at all, and it may not have been insisted on in argument, although it was the principal question made by the

defendants in the trial in the county court;—the second exception is held to be untenable;—and, in respect to that part of the charge which is stated in the bill of exceptions, it is said that " the law of the charge is right, but is inapplicable to the case." (p. 620.) The opinion is devoted mainly to the discussion of questions which were not made on the trial, and which did not legitimately arise on the bill of exceptions, and it rests upon two singular mistakes or errors of fact. One of these errors is the statement that " the defendants insisted, and requested the court to charge the jury, that the putting of the box on the platform at Rutland, ready for delivery, where it was seen by the plaintiff, and might have been taken by him, was a complete performance of their duty as carriers ; and that if the .baggage master thereupon retained the custody of it, with the consent of the owner, and put it into the baggage room of the depot for safe keeping, the company were only liable as warehousemen for such keeping till morning." (p. 612.) Without this statement, the principal question discussed in the opinion could not be raised ; but the bill of exceptions contains no statement of that purport, and no such request was made on the trial. It is true that the defendants' claim on the trial was in accordance with the first clause of this statement, and, upon this ground, *i. e.*, that there was a complete and perfected delivery of the box to the plaintiff at Rutland, they requested the court to rule that the evidence on the part of the plaintiff was not sufficient, *prima facie*, to entitle him to recover ; but no such claim as is stated in the second clause of this statement was made on the trial, and the term *"warehousemen"* which is made so prominent in the opinion was neither used on the trial nor does it appear in the bill of exceptions. Upon the second clause of this alleged request as to the charge to the jury depends the entire demonstration of the fancied errors of the county court in respect to the law of the case. The other error of fact upon which the opinion rests is the assumption that the entire charge to the jury upon the questions which arose on the plaintiff's evidence was stated in the bill of exceptions, notwithstanding a direct and express statement in the bill of exceptions that only so much of the charge was stated as was excepted to by the defendants. Without making this assumption, the judgment of the county court could not have been reversed, even if the principal question discussed

in the opinion had been properly raised, and conceding that the law of the opinion should have been applied to the case ; for it would have been presumed that the charge to the jury, in respect to all points except those specified was in accordance with the law as expounded in the opinion. This presumption, although it would have been a strictly legal and logical one, would not have been true in fact, because the charge in fact was confined to the case as it was presented before the court, and to the questions which were made on the trial. With much of the reasoning in the opinion I fully agree. Its logical result necessarily led to the conclusion not only that "the law of the charge was right," but also that it was "applicable to the case" as it was presented in the county court and stated in the bill of exceptions. These misconceptions or errors of fact into which the court unwittingly fell or was led, however much unintended, had the effect to convert a real case into one which was entirely simulated and supposititious. I submit that the judgment of the county court in that case was reversed, not for errors which were in fact committed, but for errors which were mistakenly assumed to have been committed, on the trial ;—that the case is not a binding authority upon any point except in respect to the questions made as to the articles which should be treated as being articles of baggage ;— and that the grounds of decision expressed on all other points in the case, resting as they do upon a clear mistake in respect to the facts stated in the bill of exceptions, are subject to be challenged and re-examined whenever a proper occasion may arise.

3. The court instructed the jury that if they found the plaintiffs entitled to recover in this case, they, (the plaintiffs,) were not confined to the value of the goods in New York, but were entitled to what the goods were worth at St. Albans at the time of the loss, deducting the freight which had not been paid, and that it would be for the jury to determine from the evidence whether the goods were worth more or less at St. Albans than the sum stated in the bill given to the plaintiffs when they purchased them, and that the plaintiffs were entitled to interest on the value of the goods from the time of the loss. The only evidence in the case as to the value of the goods was the fact that they were purchased by the plaintiffs in New York, on the 13th of September, 1860, at the price stated in this

bill.   We think that this rule of damages was correct in itself, but that there was no evidence to justify its application to this case, and that the jury should, upon the evidence, have been limited, in assessing the damages, to the price stated in the bill, with interest thereon from the time of the loss to the time of trial.   A computation of interest on the price stated in the bill from the time of the loss to the time of trial will show that the verdict included an allowance for the increased value of the goods at St. Albans over or in addition to the price in New York and the interest thereon; but there is nothing in the evidence stated in the bill of exceptions which tends to show that the goods were worth any more at St. Albans than at New York.

4.   Upon the evidence, it cannot be questioned that the plaintiffs were the sole owners of the goods.   The interest of Rosenberg in the goods was a mere chance or possibility, and was of too speculative a character to be the subject of any action.   The plaintiffs alone were injured by the loss, and we find no error in the ruling and charge of the court on this point.   The consignor who owns the goods, and sustains the injury from the damage or loss, is the proper party to bring the action against the carrier.   *Sanford* v. *Housatonic Railroad*, 11 Cush. 155 ; Angell on Carriers, §§ 495–512 ; *Lapham* v. *Green*, 9 Vt. 407.

The motion in arrest of judgment is not now insisted on by the defendants, and these conclusions dispose of all the questions which have been discussed in the argument.   The result is, that the judgment of the county court for the plaintiffs is reversed, and the case will be remitted to that court with an order for a new trial.