# REPORTS.

## BARTER & CO. v. WHEELER & a.

Where flour was brought to Ogdensburg by the Northern Transportation Company, consigned to the plaintiffs at Concord, N. H., and to go over the railroad of the Northern (N. Y.) Railroad Company, and was deposited in a storehouse under the general control of the Transportation Company; and according to the course of business there for six or seven years, a clerk of that company forwarded to the plaintiffs a way-bill marked "duplicate," and headed "Northern Railroad Company," and dated "Ogdensburg Depot," but not signed by any one; but reciting that said company had received of the Transportation Company the flour in question, and promising to deliver it to the consignees, subject to charges as specified; and at the same time sent to the Northern Railroad Company a duplicate of such way-bill, which was entered by them in a book called the "Receipt Book," or the "Lake Freight Ledger," and the Transportation Company also drew upon the consignees for the freight to Ogdensburg; after which sending of the way-bills in the usual course of business, orders and applications respecting the freight were addressed by the consignees to the railroad company, and were acted upon and answered by its agents, without any communication with the Transportation Company on the subject; and when, also, the plaintiffs' evidence tended to prove that after the loss of the flour by fire, they applied to the defendants, then the trustees of said railroad company, to adjust their loss, and received no notice that defendants had not received the flour, or that any other party had possession of it at the time of the fire, or was responsible for it; and that plaintiffs had no knowledge that the defendants had not received the flour, or that they denied the receipt of it, until after this suit was brought.

It was *held* that if these way bills were sent to the consignees with the knowledge of the defendants, and with the intention on their part that they should be received and acted upon by the plaintiffs as the representations and undertakings of the defendants, and they were so received and acted upon by the plaintiffs, who were induced thereby to make this claim and bring this suit, the defendants would be estopped to deny that they had so received the flour.

VOL. XLIX.    2

It was also *held* that upon this evidence it was competent for the jury to find all the facts necessary to constitute such estoppel.

It was also *decided* that while the defendants had the flour so received at Ogdensburg, awaiting the means to forward it, they held it as common carriers, and not as warehousemen, unless by some order or agreement of plaintiffs they were authorized to store it for them, and this would be so, even if plaintiffs had reason to expect a delay of some weeks at Ogdensburg by reason of the accumulation of freight there.

It was also *held* that the counting of the flour when delivered by the Transportation Company to the railroad might be waived by them, and that it was competent for the jury from the circumstances stated to find that they had done so, and that the delivery was complete.

When goods are delivered to a transportation company to be transported over its route, and over several railroads to the place of its destination, the companies having associated and formed a continuous line, an intermediate company is liable for the loss of the goods happening upon its part of the line.

When several distinct corporations associate together and form a continuous line of common carriers, each being empowered to contract for freight and passengers for the whole line, and to receive pay for the same, which is to be divided in prescribed proportions, they are jointly liable for losses or injuries upon any part of the line.

When a contract is made in one state to transport goods over a line extending through two or more states, and the goods are lost, the rights of the parties will be governed by the laws of the state where the loss happened.

When common carriers by water, in their bill of lading made at Toledo, Ohio, stipulate to deliver goods to consignees at Concord, N. H., the damages of navigation, fire, and collisions on the lakes and rivers and the Welland Canal excepted, it was held that this limitation did not extend to losses by fire on the railroads.

Where the trustees, under a second mortgage of a railroad, have taken possession of it, and have afterwards by a bill in equity obtained a decree of foreclosure with a provision for a sale of the railroad in accordance with the power conferred by the mortgage, and have themselves become the purchasers as they were authorized to do by the decree, and to hold the property in trust for the bondholders, and they continued to keep possession of the railroad and operate it as such trustees, it was held that they were liable as common carriers for the loss of goods received for transportation.

CASE by Lewis Barter & Co. against Wm. A. Wheeler & a. as common carriers of freight for the loss of five thousand seven hundred and fifty-nine bushels of corn and three hundred and seventy-seven barrels of flour, and for damage to twenty-six barrels of flour, delivered by the plaintiffs to the defendants to be transported from Ogdensburg to Concord. The following facts appeared at trial on the general issue:

At the time of the alleged loss the defendants were trustees of the

second mortgage bonds of the Northern (N. Y.) Railroad Co., and were operating the railroad of that company then, and during the year 1864, under certain orders and decrees in equity, hereinafter mentioned. That company was incorporated May 10, 1845, with power to construct the railroad and "to take, transport, carry, and convey property and persons on the same." On the 11th day of February, 1850, the Northern Railroad Company executed a mortgage of the railroad and all the property belonging to the corporation to James Savage, John James Dixwell and George N. Seymour, to secure the payment of certain bonds of the company. A second mortgage was executed between the same parties April 29, 1850, On the 15th of December, 1851, another mortgage was executed to William A. Wheeler, George Curtis and Jabez C. Howe, then trustees of the said second mortgage bonds. On the 7th day of April, 1854, another mortgage (now commonly known as the second mortgage) was executed by the railroad company to the trustees last named. On the 6th of October, 1854, the said company executed a deed of surrender, of all the property held in mortgage to William A. Wheeler, Jabez C. Howe and John S. Eldridge, said Eldridge having been appointed trustee in place of George Curtis, who had resigned said trust.

On the 8th of April, 1856, the then trustees—said Wheeler, said Eldridge and Anthony C. Brown—obtained a judgment of foreclosure of mortgage against the said railroad company, by decree of the Supreme Court of the State of New York, which decree provided that all property of the company should be sold together in one parcel, subject to any rights of the trustees under the first mortgage bonds, and that William C. Brown be appointed referee to execute the order of sale, and providing also that until such sale, or if the trustees shall become the purchasers thereof, to sell the same for the benefit of the bondholders, then, until they shall sell the same for cash, or by transferring it to a new corporation, "the said trustees or a major part of them may continue to operate the said railroad," receive the rents and profits thereof, appoint all necessary agents and subordinates for its complete operation, purchase supplies, fuel, fixtures., &c., keep the road, rolling stock, &c., in good and proper repair, bring suits for the recovery of debts, freight-tolls, &c., and for any injury to the property mortgaged, and defend any suits in respect to the property mortgaged. On the 21st day of October, 1856, a sale of said property having previously taken place according to the decree aforesaid, the said referee executed his deed of conveyance of said property to said Wheeler, Eldridge and Anthony C. Brown, and possession under said deed was subsequently taken by the grantees as trustees as aforesaid. On the 22d day of May, 1863, William C. Brown was appointed by the Supreme Court of New York trustee and mortgagee in the place of Anthony C. Brown, who had departed this life.

On the 11th day of February, 1863, an agreement in writing was entered into between certain parties, representing the line of

railroads between Boston and Ogdensburg, (which agreement was signed by the defendant Eldridge, in behalf of these defendants, trustees as aforesaid,) and the Northern Transportation Company of Ohio, representing a line of steam propellers upon the western lakes, which agreement consisted in the formation of a joint transportation line between Boston and various points on the line of railroads between Boston and Ogdensburg, and various points on the western lakes, for the then ensuing season of navigation, and as much longer as the contracting parties might agree. This agreement provided, among other things, that all property transported over the route should "be delivered by each party to the other, as heretofore customary, and all property so delivered and received shall be promptly forwarded, so far as is practicable, by the party receiving the same, in its proper order of precedence;" that each party should be liable for damage done to freight upon their respective portions of the route. The contract also provided that the same should continue in force from year to year until notice should be given by one party to the other of a desire to discontinue the same, and that either party might discontinue and abrogate the same by giving written notice to the other therefor, during the month of December of each year, and not otherwise.

The defendants claim that this contract was abrogated by a notice in writing, signed by George Stark as chairman of the board of managers of the various roads constituting the line between Ogdensburg and Boston, known as the "Through Line." This notice was dated December 21, 1863, and Mr. Stark produced a copy of the same, and also a reply thereto, dated December 31, 1863, and signed P. Chamberlin, Vice President of the Northern Transportation Company. A copy of this notice and the reply may be made a part of the case. At the time of the receipt of the plaintiffs' goods by the Northern Transportation Company, for transportation, no contract for the transportion of freight existed between said line of railroads and said transportation company, other than that to be inferred from the regular course of business between the parties. The business transacted between the Northern Transportation Company and the railroads during the year 1864 was conducted in accordance with the provisions of the contract which expired in 1863, and there was no change in the manner of doing business between said Northern Transportation Company and the railroads, except as regarded rates, divisions, &c., but the Northern Transportation Company shipped and forwarded freight over said railroads in the same manner substantially as they did in 1863.

The custom of doing business as to flour and other rolling freight between the transportation company and the railroad at Ogdensburg during the year 1864, was as follows:

On the arrival of the boats the transportation company delivered the flour or other rolling freight on the dock. It was then taken in charge by J. M. Chamberlin, who was in the general employment of the transportation company, or men employed by him, and the same

men also loaded this kind of freight on the cars, when it went forward by rail. If the freight was not forwarded immediately, it was put into the storehouse known as "the railroad buildings or shed" by the same men. These buildings were the property of the railroad, and were occupied for the temporary storage of freight going East, and also for any other purpose the trustees might desire. The keys of the buildings were in the possession and actual control of said Chamberlin. There was no lease of the buildings, nor any compensation for the use of them paid by the transportation company, or charged to them by the defendants. The transportation company also stored in the same buildings freight brought by them, which was not to go further East by rail, and freight received there by them to be carried West. The business was done in this way under a verbal arrangement made in April, 1864, between D. W. C. Brown, Assistant Superintendent of the railroad, and Philo Chamberlin, Vice President of the Transportation Company; and J. M. Chamberlin acted in the employment of Philo Chamberlin. When freight stored in these buildings under this arrangement was to go forward by rail, men in the employment of Chamberlin took it from the buildings and put it in the cars on the track, and an agent of the railroad took an account of the amount so delivered. As compensation for this service the railroad allowed the transportation company twelve and one-half cents per ton.

When grain in bulk arrived at Ogdensburg it was transferred from the boat by the defendants to their elevator. For this one half a cent per bushel was charged to the owner, and a quarter of a cent to the boat. Where the grain was consigned through by rail at the contract price no charge was made to the owner for elevating or storage, but the amount for elevating was settled between the railroad and the transportation company. This charge of half a cent per bushel to the owner where the grain was consigned to Ogdensburg covered six days storage. If it was stored longer, the owner was charged at the rate of a quarter of a cent per bushel for every additional ten days storage. The plaintiffs had no knowledge that any charge was made to the owner for elevating or storing through freight. They never paid anything for storage of grain or other freight contracted through, nor was any claim ever made on them for storage of such freight, or any notice given them that the freight sued for in this case, or any other freight, was held by the defendants on storage for the plaintiffs.

At the time when the plaintiffs' corn and flour were shipped and taken to Ogdensburg, and for six or seven years previous, the course of the business in reference to the transfer, of through freight from the transportation company to the railroad had been, and was, as follows: on the arrival of the boat and landing of the freight, the transportation company delivered to the railroad an order or way bill containing an account of the goods brought by the boat to go forward by the railroad, showing to what persons and places the different goods were consigned, and the charges to each

for transportation to that point. This order or way-bill was then entered by the railroad company in a book called the "Receipt Book," or the "Lake Freight Ledger." A clerk or agent in the employment of the transportation company then sent to each of the consignees a document, marked "duplicate," and headed, "Northern Railroad Company," dated "Ogdensburg Depot," reciting that, "said company have received of the Northern Transportation Company of Ohio in apparent good order the following described articles marked as per margin, which the said company promises to deliver to consignees as per margin subject to charges as specified." The name of the boat by which the freight was received was marked on the margin. The document was not signed by any agent or officer of either the railroad or the transportation company. No other notice or acknowledgment was sent by either company to the consignees on the arrival of the goods at Ogdensburg. The amount of charge for transportation to Ogdensburg was stated in these bills, and the transportation company drew on the consignees for the amount. On the arrival at Ogdensburg of the several consignments to the plaintiffs of corn and flour, lost by the fire hereinafter mentioned, a notice or way-bill in the form above described, was forwarded as aforesaid, and received by the plaintiffs. A copy of exhibit (E) annexed to the deposition of George A. Eddy, being the bill forwarded to the plaintiffs, dated July 25, 1864, is to be made part of this case.

On the 2d of August succeeding the fire, which took place on the 28th of July, 1864, the plaintiffs applied to the defendants for an adjustment of their loss. No notice was then given to the plaintiffs that their flour had not been received by the defendants, or that any other party had possession of it at the time of the fire, or was *responsible for it*, and the plaintiff, Barter, testified that he had no knowledge or notice that the defendants had not received the flour, or that they denied the receipt of it, until after this suit was brought. There was no evidence that the plaintiffs had any knowledge or notice of the way in which their way-bills were made out and sent to consignees, except such as might be derived from the form of the notices themselves, and their dealings with the parties after the notices were sent. In the usual course of the business after the receipt by the consignees of these way-bills, orders and applications respecting the freight were addressed by them to the railroad company, and were answered and acted on by the agents and officers of the railroad, and there was no evidence of any communication between the consignees and the transportation company respecting freight after the receipt by the consignees of these way-bills.

Two hundred and fifty-seven barrels of the plaintiffs' flour destroyed by the fire hereinafter mentioned, and the twenty-three barrels which were damaged, were then in the buildings controlled as is before stated by men in the employment of the transportation company. The other hundred barrels had been put in the cars and "tallied" to the railroad, and were on the track waiting to go forward by the next

train, when they were burned. The defendants contended that the two hundred and eighty barrels, which remained at the time of the fire in the buildings, were then in the possession of the transportation company, and had never been received by the defendants either as common carriers, or warehousemen, and that therefore they were not responsible for the loss, but the plaintiffs must look to the transportation company. ·On this point the court instructed the jury that if the notices or way-bills before described, were made out and sent to the consignees with the knowledge of the defendants, and with the intention on their part that they should be received and acted on by the consignees as the representations and undertakings of the defendants, and they were so received and acted on by the consignees they would bind the defendants as their act, though made out and sent by men in the general employment of the transportation company, though not signed by any officer or agent in behalf of the railroad, and that if these way-bills or notices sent to the plaintiffs in this case were intended by the defendants to be received and acted on by the plaintiffs as the representations and undertakings of the defendants, and were received and acted on by the plaintiffs as such in making this claim and bringing this suit, with the belief on the part of the plaintiffs that they were the authorized representations and undertakings of the defendants, and that they stated the truth, the defendants were estopped to deny that the representations and undertakings contained in the bill were made by their authority, and that the goods were received by them to be forwarded as stated in the bills.

There was evidence that at certain seasons of the year it had frequently happened in former years that the boats of the transportation company brought to Ogdensburg to be forwarded by rail more freight than the railroad had means to forward forthwith; that at the time when the plaintiffs' flour and grain sued for in this action arrived at Ogdensburg, there were at that place awaiting transportation by rail about two hundred car loads of grain and about one hundred car loads of flour; that it would have required a month, or at least three weeks, for the railroad with the means they had to carry this amount forward; and that the flour and corn of the plaintiffs consumed by the fire were then detained at Ogdensburg for want of means to send it forward earlier by the railroad. There was also evidence that the plaintiffs for several years before were large shippers of flour and grain from the West to Eastern points by way of Ogdensburg; from which the defendants contended that the plaintiffs when they shipped their flour and grain at ports on the lakes must have been aware that it would be, or was liable to be delayed at Ogdensburg, because the railroad would not have means to forward it forthwith, and that they must be understood to have consented that it might be detained there for that cause; and they maintained that, the flour and grain, being kept back for that cause, the defendants held it for the plaintiffs in store as warehousemen and not as common carriers. The court instructed the jury that if the plaintiffs when they shipped their corn and flour were aware that it would

be, or was liable to be detained at Ogdensburg, because in the usual course of the business, the boats at that season brought more freight to Ogdensburg than the railroad could carry forward forthwith they would have no claim for damages, occasioned by delay for that cause, provided the freight was safely kept and forwarded as soon as the railroad had means to do it, but that if the defendants received the freight as common carriers and undertook to forward it by their road to the consignees as stated in the way-bills sent to the plaintiffs on its arrival at Ogdensburg, they would receive and hold it as common carriers, and would be liable for it as common carriers till they had means to send it forward, unless after such receipt of the freight they were authorized by some order or agreement of the plaintiffs to hold it in store for them, and such order or agreement might be implied from circumstances, but not from the mere fact that the goods were detained because the defendants had not the means to send them forward sooner.

By the bills of lading given to the plaintiffs when the goods were shipped on the boats of the transportation company, at points on the lakes that company promised to carry and deliver the freight safely to consignees, ("the dangers of navigation, fire and collisions on the lakes and rivers, and on the Welland canal excepted.") The defendants contended that these exceptions related to the whole transportation until the freight reached the consignees, that the jury might find that it excluded the risk of accidental fire at Ogdensburg after the goods were received by the defendants to be transported by their railroad, but the court instructed the jury that the exception of these risks in the bills of lading related only to the transportation by the transportation company, and would not have the effect to discharge the defendants from their liability for loss by accidental fire while they held the goods as common carriers. The bills of lading were all in the same form with that of June 27, 1864, annexed to the deposition of George A. Eddy, and marked as exhibit "B," a copy of which is to be made a part of this case.

The defendants contended that they were acting under the orders and decrees of the court in the suit brought to foreclose the mortgage, which they held as trustees, and that they were thereby exempted from liabilities to the plaintiffs in this action, but the court held and instructed the jury that the defendants notwithstanding the proceedings in that suit were liable to answer in this action. A copy of the record in that suit is annexed to the case of *George Hutchins & Co.,* v. *these defendants,* hereafter mentioned, and marked (Paper E.)

The elevator, depot and certain other buildings of the defendants at Ogdensburg were destroyed by an accidental fire on the 23d of July, 1864. The plaintiffs then had in the elevator seven hundred and fifty-five bushels of corn which arrived at Ogdensburg on the first of July, 1864, and five thousand and four bushels which arrived there on the 25th of the same July, in all five thousand seven hundred and fifty-nine bushels. They also had there three hundred barrels of flour which arrived on the 5th, and one hundred barrels which

arrived on the 11th of July, 1864; all this freight was consigned through to the plaintiffs and bills were forwarded to them on the arrival of these several consignments at Ogdensburg, in the manner and form before described. It was agreed that the corn was of the value of $1.58 per bushel. The plaintiffs received on the 10th of August, 1864, $945.18 for their proportion of the sum realized on a sale of the corn saved from the fire. Seventy-seven barrels of flour agreed to be of the value of $12.75 per barrel, and two hundred and eighty barrels of the agreed value of $12.25 per barrel were consumed, and twenty-three barrels are agreed to have been damaged to the amount of $3.00 per barrel, by the fire:

The jury returned a verdict of $15,432.54 for the plaintiffs, which the defendants move to set aside for error in the foregoing rulings and instructions.

The papers and documents copied in the case of *George Hutchins & Co.,* v. *these defendants,* now pending in the law term of this court, and the copies of papers and documents annexed to the same case, may be referred to in the hearing, and are to be taken as part of this case.

EXHIBIT "B."
NORTHERN TRANSPORTATION COMPANY.
DUPLICATE.
No.                                    TOLEDO, OHIO, June 27, 1864.

SHIPPED, In good order and well conditioned, by the Northern Transportation Company, as Agents and Forwarders, for account and risk of whom it may concern, on board the Screw Steamer Granite State, whereof Forsyth is Master, now lying in the Port of Toledo, and bound for Ogdensburgh, the following articles, marked and numbered as in the margin, and which are to be delivered in like good order and condition, (the dangers of Navigation, Fire, and Collisions on the Lakes and Rivers, and on the Welland Canal excepted,) without delay, unto Consignees, per margin, or his or their Assigns, they paying Freight and Charges.

IN WITNESS WHEREOF, the Agent of said Screw Steamer hath affirmed unto two Bills of Lading, all of this tenor and date, one of which being accomplished, the other to stand void.

George Hutchins & Company,  216 Barrels of Flour,  " Tip-Top."
Concord,                    100     "          "      " Favorite."
    N. H.                                Lake Freight,
George A. Eddy, Agt.,    Thro' Toledo to Concord at 110.
Ogdensburgh,                              Walker & Hayes,
    N. Y.                                    Agent.

EXHIBIT "E."
NORTHERN RAILROAD COMPANY.
Propl. "Ontario."
DUPLICATE.
No.                                OGDENSBURGH DEPOT, July 25, 1864.
Said Company have received of George A. Eddy, Agent, in

apparent good order, the following described articles, marked as per margin, which the said Company promises to forward by its Railroad, and deliver to Consignees as per margin, subject to charges as specified.

| Lewis Barter & Co., | 5,007 34-100 Bush. No. 1 Corn, | | |
|---|---|---|---|
| Concord, | Lake Freight per bush. 13 4-10 | | 671 02 |
| N. H. | Ogdensb'h to Con'd, " 20 1-10 | | |
| | | 33 1-2 through. | |
| Lewis Barter & Co., | 200 Bbls. Flour, " White Rose," A. | | |
| Montpelier, | Lake Freight per bbl., | 55, | 110 00 |
| Vt. | Odg. to Montpelier, " | 66, | |
| | | 1 21 through. | |
| Lewis Barter & Co. | 100 Bbls. Flour, " White Rose," A. | | |
| Littleton, | Lake Freight, | 55, | 55 00 |
| N. H. | | | |

Draft for $836 02

*Marshall & Chase,* for plaintiffs.

*Minot, Mugridge & Tappan, Foster & Sanborn,* for defendants.

BELLOWS, C. J.  The first question in the natural order of inquiry is, whether the goods were in fact received by the defendants as common carriers.

Upon that point the plaintiffs rely much upon the fact that upon the receipt of the second parcels of flour and grain at Ogdensburg, papers were forwarded to the plaintiffs purporting to acknowledge the receipt by the Northern Railroad Company from the Northern Transportation Company, of such flour and grain, with a promise to deliver the same to the plaintiffs.

The case finds that the course of business during the year 1854, where this flour and grain was received, was this: on the arrival of the boats, the transportation company delivered the flour and other rolling freight on the dock.  It was then taken in charge by J. M. Chamberlin, who was in the general employment of the transportation company, or men employed by him, and the same men also loaded this kind of freight on the cars when it went forward by rail. If the freight was not forwarded immediately, it was put into the store-house, known as the railroad buildings or shed, by the same men.  These buildings were the property of the railroad, and were occupied for the temporary storage of freight going East, and also, for any other purposes the trustees might desire.  The keys of the buildings were in the possession and actual control of said Chamberlin.  There was no lease of the buildings nor any compensation for the use of them paid by the transportation company, or charged to them by the defendants.  The transportation company also stored in the same buildings freight brought by them, which was not to go

further East by rail, and freight received there by them to be carried West. The business was done in this way under a verbal arrangement made in April, 1864, between D. W. C. Brown, Assistant Superintendent of the railroad, and Philo Chamberlin, Vice President of the Transportation Company; and J. M. Chamberlin acted in the employment of Philo Chamberlin.

When freight stored in these buildings under this arrangement was to go forward by rail, men in the employment of Chamberlin took it from the buildings and put it on the cars on the track, and an agent of the railroad took an account of the amount so delivered. As compensation for this service, the railroad allowed the Transportation Company twelve and one-half cents per ton.

Grain arriving in bulk was transferred from the boat by the defendants to their elevator, and for this there was charged to the owner one-half cent per bushel, and one-quarter cent per bushel to the boat. If the grain was consigned through by rail at the contract price, no charge was made to the owner for elevating or storage, but the amount for elevating was settled between the railroad and the Transportation Company. The half-cent per bushel charged the owner covered also six days' storage. If stored longer, there was a charge of a quarter of a cent per bushel for every additional ten days.

The plaintiff had no knowledge that any charge was made to the owners of through freight for elevating or storing it, and never paid anything for such storage.

At the time the plaintiffs' flour and corn were shipped and taken to Ogdensburg and for six or seven years previous, this course of business in reference to the transfer of through freight from the Transportation Company to the railroad had been and was as follows: on the arrival of the boat and landing of the freight the Transportation Company delivered to the railroad an order or way-bill containing an account of the goods brought by the boat to go forward by the railroad, showing to what persons and places the different goods were consigned, and the charges to each for transportation to that point.

The order or way bill was then entered by the railroad company in a book called the "Receipt Book," or the "Lake Freight Ledger." A clerk or agent in the employment of the transportation company then sent to each of the consignees a document marked "duplicate," and headed "Northern Railroad Company," dated "Ogdensburg Depot," reciting that said company have received of the Northern Transportation Company of Ohio in apparent good order the following described articles, marked as per margin, which the said company promises to deliver to consignees subject to charges as specified. The name of the boat was marked on the margins. The document was not signed by any agent or officer of either the railroad or the transportation company. No other notice or acknowledgment was sent by either company to the consignees on the arrival of the goods at Ogdensburg. The amount of charge for transportation to Ogdensburg was stated in these bills, and the transportation company drew on the consignees for the amount.

In the usual course of business after the receipt by the consignee of these way-bills, orders and applications respecting the freight were addressed by them to the railroad company, and were answered and acted upon by the agents and officers of the railroad, and there was no evidence of any communication between the consignees and the transportation company respecting freight after the receipt of these way bills.

It appeared that on the arrival at Ogdensburg of the several consignments to the plaintiffs of corn and flour, a notice or way-bill in the form aforesaid was forwarded to, and received by, the plaintiffs. The fire which destroyed these goods occurred July 28, 1864, and the plaintiffs on August 2d of the same year, applied to the defendants for an adjustment of their loss. No notice was then given to the plaintiffs that their goods had not been received by the defendants, or that any other party had possession of them at the time of fire, or was responsible for the loss, and the plaintiff Barter testified that he had no knowledge or notice that defendants had not received the flour, or that they denied the receipt of it, until after this suit was brought, and there was no evidence that the plaintiffs had any knowledge or notice of the way in which their way-bills were made out and sent to consignees, except such as might be derived from the form of the notices themselves, and their dealings with the parties after the notices were sent.

The case finds that the defendants contended that two hundred and eighty barrels of the flour, destroyed and which remained in the buildings when the fire happened, had never been received by the defendants in any capacity, but remained in the possession of the transportation company; whereupon the court gave instructions to the jury upon the subject of estoppel (p. 15), to which the defendanst excepted.

The exception now urged is that the evidence did not lay any sufficient foundation for such assumptions and suppositions as are contained in those instructions; or in other words, that there was no evidence tending to prove the facts essential to the creation of an estoppel against these defendants.

It will be observed that there was no exception upon the ground that there was no proof that defendants had received the two hundred and eighty barrels of flour, but the exceptions were to the rulings and instructions of the court which apply only to the matter of estoppel. This, however, is immaterial; for if the estoppel is sustained, the delivery is established; and if not sustained, the verdict must be set aside; for the jury may have founded their verdict upon the estoppel.

A material and essential element of the estoppel in this case is that the way-bills or orders were sent to these plaintiffs with the knowledge of the defendants, and with the intention on their part that they should be received and acted on by the consignees, the plaintiffs, as the representations and undertakings of the defendants, and that they were so received and acted upon.

The defendants now contend that there was no evidence tending to show that the defendants had any knowledge that such papers were sent by the transportation company to the plaintiffs.

There was, however, proof that such papers were sent in this case, and that it was in accordance with the usual course of business at that time, and for six or seven years previous.

If, then, such a course of business had been established for six or seven years with defendants' knowledge and consent, the papers sent to these plaintiffs might well be found to have been sent under their authority. The question then is, whether the jury were warranted in finding that this course of business existed with their consent.

The way-bill or order was sent by a clerk or agent in the employ-ment of the transportation company, and the purpose of it was to show that this company had performed its whole duty and carried the freight or the goods by a delivery to the railroad; and at the same time to show an acknowledgment by the railroad company that it had received the goods, with a promise to deliver them at the place of their destination.

It is true that these papers were not signed by any officer of either company, and this would naturally tend to diminish the credit that would otherwise be given to them; and this circumstance would be open to observation to the jury; but still we think these papers might reasonably be regarded as representations by the railroad company, if sent by their authority, that they had received the goods and would carry and deliver them to the consignees.

The question then is, whether there was evidence from which the jury could legally find that this course of business was established with the knowledge and consent of the defendants.

The evidence on that point is derived from the character of the custom itself, and the extreme improbability that it could exist so long as six or seven years without defendants' knowledge and con-sent; together with the fact that after these way-bills were received by the consignees, all the subsequent arrangements respecting such freight were made between the consignees and the railroad company, without any intervention on the part of the transportation company. It appears also that on the landing of the freight at Ogdensburg, the transportation company delivered to the railroad company an order or way-bill containing an account of the goods brought by the boat and to go forward by the railroad; stating the persons to whom consigned and the charges to each for transportation to that point, and that the way-bills or orders were then entered by the railroad company in a book called the " Receipt Book," or the "Lake Freight Ledger," and the clerk or agent of the transportation company then sent the document marked " duplicate," and headed " Northern Rail-road Company" to each of the consignees. From the documents copied into the case of George Hutchins & Co. against the defend-ants, which are to be taken as part of this case, it appears that the way-bills or orders so sent to the consignees were duplicates of those furnished to the defendants.

Upon this evidence we think it was competent for the jury to find that these way-bills were sent to the plaintiffs with the knowledge of the defendants, and with the intention on their part that they should be received and acted upon by the plaintiffs as the representations and undertakings of the defendants.

If the defendants authorized them to be so sent, it was competent for the jury to find that they intended that the plaintiffs should receive and act upon them as being what their language would naturally and reasonably import—which was that defendants had received these goods and would transport and deliver them.

So we think the jury might properly have found that the plaintiffs received these papers as the representations and undertakings of the defendants, and acted upon them as such in making this claim and bringing this suit, and with the belief that they were the authorized representations and undertakings of the defendants, and that they stated the truth.

If these facts were found, the defendants would be estopped to deny that they had received and promised to transport and deliver the goods to the plaintiffs.

But the defendants object that the jury ought to have been instructed that to constitute an estoppel, it must appear that the plaintiffs would not have made this claim or brought this suit but for the representations contained in the way-bill.

The instructions actually given on this point were in substance that if these representations were received and acted upon as true by the plaintiffs in making this claim and bringing this suit, the defendants would be estopped to deny their truth, and we think that the import of this language fairly is that to constitute an estoppel, plaintiffs must have been induced to bring this suit by a belief in the truth of these representations; or that they acted upon the belief that the representations were true, and they changed their position.

If this were found to be so, the defendants were estopped; *Drew* v. *Kimball*, 43 N. H. 285, and cases cited. The point was whether plaintiffs were induced to make this claim, and bring this suit by their belief in the truth of these representations, and to this the finding that they acted on that belief, is substantially equivalent; they could not fairly be said to act upon that belief, unless their act was induced by it. We do not therefore perceive that the jury were likely to be misled by the instructions.

We think then that the instructions were correct, although they might properly have been more specific on the point under consideration; but as no other instructions were asked for, we think the verdict ought not to be disturbed for this course; *Kent* v. *Tyler*, 20 N. H. 121; *Wright* v. *Boynton*, 37 N. H. 22; *Hooksett* v. *Amoskeag Co.*, 44 N. H. 105.

The next question is this, if the goods were delivered to defendants, did they hold them as carriers or as warehousemen.

On this point the defendants contend that while the goods were detained at Ogdensburg awaiting the opportunity to be forwarded,

they were held by defendants as warehousemen, and not as carriers; upon the ground that at certain seasons in former years it frequently happened that the boats brought to Ogdensburg more freight than the railroad had means to forward forthwith, and that at the time the plaintiffs' goods arrived there was an accumulation of flour and grain there that would require a month, or at least three weeks, for the railroad to send forward, with the means they had; and that plaintiffs' goods were detained on that account; and while so detained were burned. That plaintiffs have been large shippers for several years before, by that route, and must have been aware that their goods would be, or were liable to be, delayed at Ogdensburg for the reason above mentioned; and, therefore, must be understood to have consented to such delay.

The court instructed the jury that if plaintiffs were aware that their goods would be, or were liable to be, so detained at Ogdensburg for the reason aforesaid, they could claim no damages for such delay, provided the goods were kept safely and forwarded as soon as the railroad had means to do it; but if they received the goods as common carriers and undertook to forward them by their road, as stated in the way-bills sent to the plaintiffs, they would receive and hold them as common carriers till they had means to send them forward; unless, after such receipt of the freight, they were authorized by some order or agreement of the plaintiffs to hold it in store for them; and such order, or agreement, might be implied from circumstances, but not from the mere fact that the goods were detained because the defendants had not the means to send them forward sooner.

The objection to these instructions urged by the defendants is, that they leave the jury to infer that when the goods were placed in the warehouse, they were delivered to the defendants as carriers; whereas, it ought to have been explained to the jury that they might have received them in another capacity, leaving it for them to find whether defendants received and held them as warehousemen during the delay, or as carriers.

The answer to these suggestions is, that these instructions were correct, and that if the defendants thought it desirable that the difference between holding the goods as warehousemen and as carriers should be explained, they should have asked for it. So the instructions were correct in saying that if the goods were delivered to defendants as carriers, and they undertook to forward them as stated in the way-bills, they would be liable as common carriers during such delay, unless they were ordered by the plaintiffs to hold the goods in store for them.

This, we think, corresponds with the well-settled rules of law on this subject. If the goods were received by defendants to be transported immediately, or without any delay for the convenience of the shipper, and were held back merely for the convenience of the defendants, because they had not the means to forward them at once; then the deposit in their store-house would be regarded as merely accessory to the carriage, and the defendants would be liable as car-

riers : *Moses* v. *Boston & Maine Railroad*, 24 N. H. 82; Story on Bail. § 5, 533, 536; *Fitchburg & Worcester R. R.* v. *Hanna & al.*, 6 Gray 541; *Judson* v. *Western R. R. Corp.*, 4 Allen Rep. 520. In that case a distinction is pointed out between the cases where the carrier holds the goods as carrier, and where he holds them as a warehouseman. If the goods when deposited with him are not ready for immediate transportation, and the carrier cannot make arrangements for their carriage until something further is done, or some further direction is given, or communication made concerning them, by the owner, the deposit must be considered as for the convenience of the owner, and the receiver responsible only as a warehouseman.

In the case before us, the goods were ready for immediate transportation so far as the owner was concerned; and the delay was merely for the convenience of the carrier.

It is urged, to be sure, that in respect to the flour something remained to be done before the delivery to the defendants was complete; and that is, that according to the usual course of business then, the flour should be counted off as placed upon defendants' cars. It was competent, however, for the defendants to waive this ceremony and to take the flour at the count returned by the boats, and it was competent for the jury, as we had seen, to find conclusively that they had done so, and that the flour, as well as grain, was in their hands as carriers according to the way bills forwarded to the plaintiffs.

This case differs from *Judson* v. *Western Railroad Company*, 4 Allen 520, cited by defendants' counsel. There by the course of business when freight was sent by the New York Central Railroad across the river to the Western Railroad, an expense bill showing the freight charges of the Central Road was sent, and on receiving it, the servants of the Western Road compared the goods with these bills, and if found correct they were checked and entered upon the books of the Western Road. The defendants' counsel requested the court to charge the jury that if these expense bills had not been sent although the goods had been delivered to the defendants' agents, they would not be liable as carriers, but only as warehousemen. This, the court declined to do, and for that cause the verdict for the plaintiff was set aside; the court putting it upon the ground that the goods were not in condition for immediate transportation.

In the case before us, the bills were sent and the evidence tended to prove that both carriers united in representing the goods to have been received · by the defendants, who engaged to forward them. In *Judson* v. *Western Railroad*, no stress is placed upon the fact the goods were not counted and checked, but the decision went upon the ground that the expense bills were indispensable to identify the goods, and to show the amount of the Central Road claim for freight to Albany.

In the present case such bills had been sent, and there was evidence that the two companies united in representing to plaintiffs that the transfer to the defendants was complete.

Besides upon the subject of the delivery and receipt of the goods

no exception appears to have been raised, except as to the instructions in respect to the estoppel, which have already been considered.

The next question is as to the general liability of an intermediate carrier under circumstances like the present. It must be regarded as the established law of England, that if goods are brought to a common carrier to be carried to a particular place, and they are so directed, and he receives them without limiting his responsibility to his own road, this is *prima facie* evidence of a contract as carrier, to transport and deliver them at the place of their ultimate destination, although it may be beyond the terminus of his own line.

This is put upon the ground that if he undertakes so to deliver the goods it is immaterial whether he does it wholly by means of his own road, or partly by the agency of other carriers. The question is whether as matter of fact he has undertaken to perform a service. If he has, he cannot be permitted to say he was not a common carrier over the part of the route where the goods were lost or injured. Whether the agency of another carrier be the drawing over its road the goods to be delivered in a car of the contractor, or transporting them in cars of its own, the result is the same.

In the American courts there has been some hesitation in adopting the English rule, but there is a decided preponderance of authority here in favor of the doctrine that railroads and other carriers may bind themselves to carry goods beyond the line of their own roads.

As to what shall be evidence of such a contract there is some diversity of opinion in the American courts; but where several railroads make a business arrangement by which a continuous line is formed, and each sells tickets over the whole line, and contracts to carry goods through the entire route, receives the price for it in one entire sum, which is to be divided in stipulated proportions among the several roads, there is a decided weight of authority here in favor of the rule that the company receiving goods directed to any point on said continuous line is responsible as carrier for their loss or injury on any part of the line—2 Red. on Rail. 38—and cases cited—*Hart* v. *Renn. & Sar. Railway Co.*, 4 Seld. 37.

In the English courts it seems to be established that when the carrier who receiving the goods has contracted to carry them over the entire route an action will not lie against an intermediate carrier for loss or injury to the goods, although it happened upon his part of the route; and this seems to be upon the ground that he is merely the agent of the first carrier, and there is no privity of contract be-btween him and the owner of the goods.

In the American courts we do not find any cases that distinctly recognize this doctrine; and we are not inclined to adopt it in this state. When two or more railroads are associated together, and form a continuous line for the transportation of freight and passengers, giving to each the right to sell tickets and receive freight, and bargain for its transportation over the whole line, and to receive the price of said tickets and transportations, the same to be divided between them at periodical settlements; we think it would be more

correct to regard the company so selling tickets and contracting for transportations, as the agent of the several companies composing such line, rather than to regard the other companies as its agents in performing the share of service allotted to them.    The sale of such tickets, and the obtaining of such freight, are for the common benefit of all the companies, and the receipts from it are divided between them in proportion to the amount of service rendered by each, making them interested in the business as principals and not as agents. In fact they stand substantantially in the position of partners in such through business.

If there be no such connection between the several railroads, and one of them receives goods and engages to transport them to a point beyond the line of its own road, and over another road, there would be more force in the position that the latter was merely the agent of the former, and was not in privity with the consignees.

In this case it appears that the business between the transportation company and this line of railroads was conducted in 1864, when the loss in question happened, in accordance with the provisions of the contract between them, which expired in 1863; and there was no change in the manner of doing business between the transportation company and the railroads, except as regarded rates, divisions, &c.; but the transportation company shipped and forwarded freight over said railroads in the same manner, substantially, as they did in 1863.

The agreement referred to was entered into February, 1863, and to continue during the three existing seasons of navigation, and as much longer as might be provided for.    By it a joint transportation line was formed between Boston and Chicago and intermediate places and ports.    The railroads and transportation line were each to keep an officer and agent in Boston, to house and control freight for the western ports, and the transportation line was to keep and maintain offices and agents at the western ports, to receive and control freight for the line.

Provision is made for the division of the through price of freight between the transportation company and the railroads; and it is also provided that each party shall be liable for damage done to freight upon their portions of the route, and when such damage cannot be traced to either party, it shall be divided between the parties in the same proportion as each party receives on through freight.    The rates of freight from Boston, and places rating the same as Boston, are to be established and controlled by the railroads, and those from western ports to be established by the transportation company.

As the case finds that the business in 1864 was conducted in substantial accordance with the provisions of this contract, we are of the opinion that the defendants could not be considered as acting merely as the agents of the transportation company in forwarding the goods brought by that line to Ogdensburg, but rather as joint contractors, and liable for losses upon its road directly to the consignees of the goods; Angel on Car. ch. 4, 5, 93; and *Bostwick* v. *Champion & al.,* 11 Wend. 571 and cases cited.

There are numerous cases of a continuous line of common carriers formed by an arrangement between several carriers, each operating at his own expense a distinct part of the line, but the receipts from the through business being divided between them in proportion to the number of miles run by each. In such cases they are held to be jointly liable as partners throughout the entire route; Angel on Car. ch. 4, 5, 93, and cases cited; Story on Bail, § 506, and cases cited. In *Bostwick* v. *Champion & al.*, 11 Wend. 571, the defendants ran a line of stage coaches from Utica to Rochester. The route was divided into three sections, each operated by a distinct party, who furnished his own carriages, horses and drivers, and paid his own expenses. The money received after paying the turnpike tolls was divided according to the number of miles run by each party, and it was held that they were partners and jointly liable for an injury to plaintiffs' wife caused by the negligence of the drivers of one of these coaches in coming in contact with the wagon in which she was riding. A similar doctrine is maintained in *Waland* v. *Elkins*, 1 Starkie Rep. 272; *Fremont* v. *Coupland*, 2 Bing. 170.

Where an association was formed between shippers on Lake Ontario and the owners of canal boats on the Erie Canal for the transportation of goods from New York to ports and places on Lake Ontario and the St. Lawrence River, and goods shipped from New York to Ogdensburg were lost on Lake Ontario, it was held that all the defendants were liable, although some of them had no interest in the vessel on the Lake; *Fairchild* v. *Slocum*, 19 Wend. 329. See *Bradford* v. *S. C. Rail.*, 7 Richardson (S. C.) Rep. 201, where a similar association was formed between these railways to carry cotton the entire route at a certain price per hundred weight, and through tickets were given. It was held that they were jointly liable for damages on either road. See also *Hart* v. *Renn & Sar. R. R.*, 4 Seld. 37.

These views are in fact recognized in *The Nashua Lock Co.* v. *The Worcester & Nashua Railroad*, recently decided in Hillsborough county, where it was held that a carrier receiving goods at Nashua marked for New York, and receiving pay for the freight through without limiting its responsibility to its own road, is liable for loss or injury to the goods while in the hands of an intermediate company, even if without the limits of this state; it appearing that by arrangement between the several companies composing this line, that the receipts for freight were to be divided among them in prescribed proportions.

At the same time the doctrine was recognized that the intermediate carrier in a continuous line, of such a character, is also liable. This doctrine as respects the intermediate carrier is in conflict, as we have seen, with the English authorities, but we think for the reasons already assigned that in the case of a continuous line formed by several distinct companies, each operating a distinct part of the entire line, but each empowered to contract for freight over the whole route and to receive pay for the whole distance, the receipts to be divided among the several companies in prescribed proportions; it

would be competent for a jury to infer a joint contract by the several carriers to transport the goods over the entire route.

It is quite well settled now that they have the capacity to make such joint contract, and we think that from the facts stated a jury might infer it.

In *New Jersey Steam Navigation Co.* v. *Merchants' Bank*, 6 How, U. S. Rep. 344, in error, the case was, that the original plaintiff sent drafts on New York for collection by Harnden's Express, and the specie obtained was placed by the express company in a crate on board defendants' steamer which the latter had stipulated to carry at the sole risk of the former. The money was lost by the negligence of the navigation company, and they were held to be liable directly to the owners, notwithstanding the contract was with the express company alone, and there was no privity of contract between the owners and the original defendants.

This would seem not be in accordance with those English cases which hold the intermediate carrier not to be liable to the owner when a contract for the entire service was made with the first taker.

To be sure in this case the money was lost by the defendant's negligence, by what must be deemed a tort, and yet upon the doctrine of those English cases, they would not have been liable for want of privity. In that case, the contract was with the express company alone, and they employed the defendants to carry the money upon their boat, the express company having the sole charge of carrying it to and from the boat; and for aught we can see, it stands upon the same footing as those English cases where the goods were to be transported part of the distance by the first taker.

In both cases, there was a contract by the first carrier to transport the goods the entire distance, and it was held to be immaterial whether it was to be done by himself or by the agency of another.

This case must then be considered as an authority against the English doctrine which denies the liability of the intermediate carrier to the owner of the goods.

It is contended by defendants that the original bill of lading shows a contract by the transportation company to deliver the goods to the consignees in Concord.

Taking it for granted that it is so, still when it is made to appear that the defendants were joint undertakers with the transportation company, we think they may be held, for it is not a case where a party has elected to give credit to one of several partners with a knowledge of the liability of the others, but is rather like the case of dormant partners who may be joined, although the contract was with the ostensible partners alone; *Farr* v. *Wheeler et al.*, 20 N. H. 569; Story on Part. § 103 and note; Story on Agency § 291.

Besides the course of business appears to have been on the arrival of the boats at Ogdensburg, with freight for the railroads, for the transportation company to draw for the charges up to that point, as if the freight had been earned, and to send to the consignees a way-bill in the name of the Northern Railway Company, acknowledging

that it had received the goods and promising to forward them to the consignees, and as we have said the jury might legally have found that their way-bills were so forwarded with the knowledge and assent of the defendants. Upon this ground, then, the jury might have found the defendants liable unless excused for other reasons.

In addition to these views it would seem that the obligation of these defendants must be governed by the laws of New York.

The original contract was made at Toledo Ohio, but was to be performed partly in New York, and the loss was altogether in that state. If the contract was to have been performed wholly in New York, it is clear that it would be governed by the laws of that state ; *Little* v. *Riley*, 43 N. H. 109 and cases cited, and if to be executed partially in New York, we perceive no reason why in respect to that part, the law of that state should not govern, and such is the doctrine laid down in Story on Contracts, § 655, where it is said that if a contract is to be performed partly in one country and partly in another country, it has a double operation, and each portion is to be interpreted according to the laws of the country where it is to be performed, and it is said that the rule applies to a bill of lading of goods some of which are to be delivered at one port, and some at another, in different countries. This rule is also recognized in *Pomeroy* v. *Ainsworth*, 22 Barb. Sup. Ct. Rep. 118. The doctrine laid down in Story on Con. as before stated is fully sustained in *Pope* v. *Nickerson*, 3 Story Rep. 485.

In the case before us the original contract evidently contemplates a transportation of the merchandise over the Northern Railroad, and it seems to be in accordance with the established doctrine upon this subject to hold that the obligation of the carrier upon that part of the route shall be determined by the laws of New York.

If the law of New York is to govern, and we think it is, it will be found to be in accordance with the conclusion we have already reached.

The doctrine that the intermediate carrier is not liable for a loss or injury on his own road when the first carrier has agreed to transport the goods through the entire route is deduced from the doctrine of *Muschamps* v. *Lancaster and Preston Junction Railway Co.*, 8 M. and W. 421, and other cases which followed it in the English courts, it being held that when the first carrier had agreed to carry the goods to their ultimate destination, there was no privity between the owner of the goods and and the intermediate carrier, who was merely agent of the first carrier.

In the New York courts, the doctrine of *Muschamps* v. *The Lancaster and Preston Junction Railway Co.*, has not been adopted. On the contrary it was rejected in *Van Santvoord* v. *St. John et al.*, 6 Hill Rep. 157 ; decided in 1843.

In the cases of *Bostwick* v. *Champion et al*; 11 Wend. 575 ; and *Fairchild* v. *Slocum*, 19 Wend. 329, before cited ; several carriers united to form a continuous line, each operating his own portion of the line, but the receipts being divided in stipulated proportion. It was held that the undertaking was joint and all the defendants liable.

In *Hart* v. *The Renn. and Sar. R. R.;* 4 Seld. 37, then separate companies, owned portions of the line from Whitehall to Troy. The defendant ran its engine between Troy and Saratoga, and the Saratoga and Washington Railroad ran its engine between Saratoga and Whitehall, and each company ran its cars over the whole line. The plaintiff bought her ticket, and took passage at Whitehall for Troy, and the ticket was received as sufficient for her passage—part of her baggage was lost on the line. The jury found a verdict for the plaintiff and the court held that there was sufficient evidence to sustain it.

In 1847 the legislature of New York passed a law providing that when two or more railroads are connected together, and one of them receives freight to be transported to any place on the line of either of said roads, such company so receiving the freight shall be liable as common carriers for the delivery of it at such place, and providing also that if such company shall become liable by reason of the neglect or misconduct of any other company, it may collect the amount paid by it of such other company.

In the subsequent case of *Smith* v. *New York Central Railroad,* 42 Barb. 225, it was held that the intermediate carrier was liable for damages upon its own road at common law, and that the owner may have his election to sue the first taker or the intermediate carrier.

Upon these views, it was competent, we think, for the jury to find the defendants liable for the loss of their goods unless excused. Upon other grounds than those already considered.

It is further urged by the defendants that by the very terms of the contract, they are relieved from all responsibility for losses by fire ; and for this they rely upon the provision in the bill of lading, which excepts from the obligation which they assume, " the dangers of navigation, fire and collisions on the lakes and rivers, and on the Welland Canal."

For the defendants it is contended that as the undertaking of the transportation company is to transport the goods over the entire route and deliver them in Concord, the limitation on their liability in respect to losses by fire is equally extensive, and applies to the whole line.

On the other hand, it is urged that the exception, applying only to fire on the lakes and rivers, and the Welland Canal, and waiving the question whether the transportation company could thus limit its responsibility, the inquiry is what is the true construction of this exception ?

At common law carriers both by land and water were liable for all losses, or damage to goods except those caused by the act of God or the public enemies, and it is generally held in the American courts that the carrier could not limit his liability by a public notice. See *Moses* v. *The Boston & Maine Railroad;* 24 N. H. 88. In that case it was so held even where knowledge of the notice was brought home to the consignor.

The liability of the carrier, however, may be modified by the

express agreement of the parties. *New Jersey Steam Navigation Company* v. *Merchants' Bank;* 6 How U. S. Rep. 382; and the same view seems to have been taken in *Moses* v. *Boston & Maine Railroad*, 24 N. H. 90; see also 2 Redfield on Railways; 77 and cases cited.

But upon general principles, and in view of the policy of the law to hold the common carrier to a strict accountability, we think that restrictions upon the common law liability of the carrier for his benefit, inserted in a bill of lading or receipt, drawn up by himself and signed by him alone, for goods intrusted to him for transportation, are to be construed most strongly against himself, and so it is laid down in 2 Redfield on Railroads 26.

In the case now before us, the bill of lading is in the general form adopted by common carriers by water. It is made and signed by a carrier of that description; most of it is clearly applicable to the transportation by water, and that alone. The exceptions are the dangers of navigation, fire and collisions on the lakes, rivers and the Welland Canal. The first and the last clearly apply to the transportation by water alone, and the intermediate one may well be construed to apply to fire on the lakes, rivers and Welland Canal. It is certainly capable of that construction; and upon the whole, we think it the most natural. The danger from fire is associated directly with causes which apply only to water transportation, and the maxim, *noscitur a sociis*, is often resorted to in aid of construction. Broome's Legal Maxims 450 and cases cited. In *Bennett* v. *Brooks*, 9 Allen, Rep. 118, great weight was given to this canon of construction. The question was upon the construction of a statute which provided, that " whoever keeps open his shop, workhouse or warehouse, or does any manner of labor, business or work," &c., shall be punished, &c., and it was held that the general terms labor, business or work, although by themselves they would include all secular acts, yet being qualified by the words immediately preceding them, viz., shop, workhouse or warehouse, they are to be restrained so as to signify only such acts as are of the same nature *ejusdem generis* with those with which they are associated.

In the present case, as the term fire is associated with terms which clearly apply to water transportation alone, it affords a strong argument against a construction that should make it apply to the transportation both by water and land. We think, also, that to justify the finding of the discharge of a common law liability by the assent or agreement of the consignor, and especially by means of a bill of lading, which is the act of the carrier alone, the terms ought to be explicit and unequivocal, and doubtful expressions ought to be taken most strongly against the carrier, and such we think has been the general doctrine both in the English and American courts.

With these views, we are brought to the conclusion that the exception in respect to fire applies only to the water transportation, and not to transportation by land.

The remaining question is, whether these defendants in the capac-

ity in which they operated the railroad, are liable as common carriers for losses upon the road.

The objection urged by defendants' counsel is that they were in possession of the railroad merely as receivers, and acting under the authority of the court.

We think, however, that this is not the correct view of the case. They were originally mortgagees of the railroad in trust for the security of certain bondholders, and the interest not being paid, the corporation surrendered up to them the possession, and in April, 1856, under a decree of the Supreme Court in New York, the whole property was sold by an officer called a referee appointed by the court for that purpose, and sold to these defendants. By the decree the referee was directed to sell and convey to the purchaser the entire property subject to a prior mortgage, and out of the proceeds to pay the costs and expenses, and to pay to these mortgagees the amount due upon their mortgages; with a provision that if no other person should bid for said property an amount equal to the sum due on said mortgages for principal and interest, over and above the amount due on the prior mortgages, these defendants were empowered to bid in and become the purchasers of the entire property, in trust to sell the same for the benefit of the bondholders, at such sum as in their discretion they may deem most beneficial for the said bondholders, and they were directed to bid not less than two millions of dollars, and upon their bidding in the property the referee was to convey it to them the same as to other purchasers, and such mortgagees were authorized to sell and convey portions of the property not needed for the use of the railroad, or to lease the same for the benefit of the bondholders, and upon the organization of a new railroad corporation under the general law; or otherwise to transfer or assign to the new corporation the property necessary for the purposes of a railroad, and receive stock in payment; providing that if on the distribution of the stock any bondholder shall prefer to receive the money, the trustees may sell his portion of stock and pay him the money; and providing also, that until the sale of said property, or if the trustees shall purchase it in trust to sell it for the benefit of the bondholders; then until they shall sell the property for cash or by transferring it to such new corporation, the trustees may continue to operate the railroad and receive the rents, profits and income thereof, and appoint the necessary agents and subordinates; purchase the necessary supplies and keep the property in good repair; pay and discharge any just claim upon the trust property, when in the opinion of the trustees the interests of the bondholders will be promoted thereby, to keep down the interest upon the prior mortgage, and authorizing them to bring any needful suits, and to defend any suits against themselves.

And it was further decreed that the Northern Railroad Company and all persons and corporations claiming under them subsequent to the commencement of the action, and the filing of the notice of the pendency thereof, and all other persons or corporations who have

any liens or claims thereon, by or under such subsequent judgments or decree, be forever barred and precluded of all right, title, interest and equity of redemption in the said mortgaged premises so sold, and every part thereof; and it is provided that the trustees may be at liberty to apply to the court for further directions.

In pursuance of this claim, a sale was made by the referee to the said trustees for three millions of dollars, and a conveyance made to them on the 21st day of October, 1856, under which the trustees have held and operated the railroad up to the time of the acts complained of.

The decree referred to was in substance a foreclosure of the mortgages held by the trustees; by it the right of redemption of the Northern Railroad Company was wholly barred and foreclosed, and after the sale, the trustees held the property in trust for the bondholders alone. Both of the mortgages contained a power of sale in case of six months' default of payment of principal or interest on the bonds when due and demanded.

The decree seems to be in general conformity with the provisions of the New York statutes, regulating the foreclosure of mortgages, with some further directions in respect to details; but there is nothing of the character of the appointment of a receiver to take possession of the property and dispose of it and make application of the proceeds under the authority of the court.

On the contrary, the trustees were already in possession of the property, and the object of the decree was to foreclose the right, of the corporation to redeem and provide for a sale in accordance with the power conferred by the mortgages to some third person, if any one should bid enough to pay off the mortgages, debts, and costs and expenses; if not, then giving the trustees power to bid it in and hold it in trust for the benefit of the bondholders.

Accordingly the property was bid in by the trustees and conveyed to them by the referee, and they continued to hold it in trust for the bondholders, divested of all right of redemption by the corporation; and they held it, we think, substantially as trustees, and not as receivers. The fact that the court undertook to give directions as to the mode of executing this trust in respect to a subsequent sale and operating the road, with the provision that they might upon the footing of that decree apply to the court for further directions, does not change the character in which the property was held by these mortgagees; such directions are entirely appropriate in the case of trustees.

There is nothing indeed to indicate that the court by its officers had taken possession of the property to manage and dispose of it for the benefit of the parties interested; but it was left in the possession of the persons to whom the corporation had conveyed it, with authority to sell it at their discretion, and until so sold to continue to operate the railroad; receive the income, rents and profits; appoint the necessary agents and subordinates; purchase supplies; keep the road, rolling stock, and fixtures in good repair; pay and discharge

any just claim upon the trust property when in the opinion of the trustees the interests of the bondholders will be promoted thereby; keep down the interest on the prior mortgages, paying and defraying the necessary expenses of any and all these items, out of the rents, profits and income of the said property; and authorizing them to bring any suits that may be necessary to recover debts, for tolls, freight or otherwise, or for injuries to the property; and to defend any suit against them or either of them in respect to the mortgaged property, or any part thereof.

It appears then that the legal title to the whole property, subject to a prior mortgage, was in these defendants in trust for the bondholders, from October 21, 1856, when the referee conveyed to them, until after the loss complained of, which occurred July 28, 1864, and that at the time of this loss and before, they were in possession of the railroad and operating it under the orders and decrees aforesaid, and were in fact the ostensible parties appearing to the public to be exercising the franchise of the corporation. The corporation itself had parted with all title to the property. The prior mortgagees did not disturb the possession of these trustees, who were authorized to take the rents, profits and income of the property, and out of them to pay the expenses of operating the road, repairs and other just claims upon the trust property.

It is obvious, therefore, that the plaintiffs' claim can be against none but these defendants, and as they come in the receipt of the profits and income of the railroad out of which such claims should ordinarily be paid, it is manifestly just that they should be held chargeable, for in no other way could the fund be reached.

If they were receivers merely, there would be some ground for holding that the plaintiffs should have made application to the court in which the decree before named was made, when an appropriate remedy might have been had; although it has been held that even against receivers an action like this could be sustained. *Blumenthal* v. *Brainard & al.*, 38 Vt. Rep. 402.

But, however, this may be, we are satisfied that the defendants were not in possession of this property as receivers, but as trustees for the bondholders, and that the character of the defendants was not changed by the sale under the decree or directions given to guide the trustees; but we think they continued to hold the property in trust substantially as before.

The case of *Sprague* v. *Smith*, 29 Vt. 421, is an explicit authority that an action of this kind can be sustained against trustees in pos-session and actually operating a railroad, and upon principle we think it is clearly so. The trustees are in possession and have the legal title, they appear to the public as the proprietors, and they alone receive and control the income of the railroad, out of which indemnity for losses is to be had. Such being the case we think they ought to be held liable, otherwise there would in most instances be substantially no remedy for the loss of goods.

In this case it would seem that these trustees were thus operating

this railroad about nine years, and to hold them not responsible as carriers, would, we think, encourage great laxity in the execution of such trusts and be productive of great evil.

With these views there must be

*Judgment on the verdict.*