Little v. Dusenberry.

HENRY S. LITTLE, RECEIVER, &c., PLAINTIFF IN ERROR, v. JAMES P. DUSENBERRY, ADMINISTRATOR, &c., DEFENDANT IN ERROR.

1. A receiver of an insolvent railroad company, empowered by statute to operate the railroad for the use of the public, acting as a common carrier, in the carriage of passengers, is not a public officer, entitled to immunity as such, but may be sued at law, in his representative capacity, by leave of the court appointing him, as the company might be, for negligence of his agents in operating the road, resulting in the death of a passenger.

2. The sale of a ticket to a railroad passenger is an undertaking that due care for his safety shall be used during the whole course of his journey over that and other roads, both in the management of the trains and the construction and maintenance of the lines in a condition fit for his passage over them.

3. This liability is not changed by leases and agreements between the companies having connecting lines, apportioning the charges, expenses and fares between them, of which the passenger had no notice.

———

On error to Supreme Court.

James P. Dusenberry, administrator, &c., of Cephas M. Woodruff, deceased, brought an action of trespass on the case, in the Supreme Court, against Henry S. Little, receiver of the Central Railroad of New Jersey, to recover damages for the death of said decedent, caused by the alleged wrongful act, neglect or default of the agents of said receiver in operating said railroad, under the statute. *Rev., p.* 294. The deceased was a passenger on a train of cars of the Central railroad, holding a ticket from Ocean Grove to New York city, on June 29th, 1882, when the car in which he was sitting was thrown from the track, at Parker's creek, by an imperfect switch, on the New York and Long Branch railroad, by which he was killed. The action was tried in the Circuit Court of the county of Essex, and a verdict rendered for the plaintiff, for $25,000. For this amount and costs, a judgment was entered in the Supreme Court, and this writ of error was brought to reverse the judgment.

For the plaintiff in error, *John W. Taylor*.

The suit below was brought in the Supreme Court by James P. Dusenberry, administrator of Cephas M. Woodruff, deceased, against Henry S. Little, receiver of the Central Railroad Company of New Jersey, to recover damages under the statute, in respect of the death of the said Woodruff, at Parker's creek, New Jersey, June 29th, 1882, while riding as a passenger in a train on the New York and Long Branch railroad, alleged to have been " caused by the wrongful act, neglect or default" of the receiver. *Rev., p.* 294.

I. The receiver was not liable to the action, and the first and second exceptions and assignments of error should be sustained.

1. The defendant was not operating the railroad or railroads under his charge, as a common carrier, nor even as an ordinary receiver, but as a public officer, by requirement of the statute, and " for the use of the public."

2. The statute referred to, which was approved February 11th, 1874, and is entitled " A further supplement to an act entitled 'An act to prevent frauds by incorporated companies,'" provides as follows :

" That whenever any incorporated railroad company of this state shall become insolvent, and the property of such company shall have passed into the hands of a receiver, by order of the Chancellor, in accordance with the act to which this is a supplement, the receiver shall, and he is hereby empowered to operate said railroad for the use of the public, subject, at all times, to the order of the Chancellor; and all expenses incident to the operation of said railroad shall be a first lien on the receipts, to be paid before any other encumbrance whatever."

3. " Railroads have uniformly been regarded as public improvements, for which the state is justified in calling into exercise the sovereign right of eminent domain, and they are still of that character, although operated by private corpora-

tions, which exclusively collect and enjoy the tolls for persons and merchandise carried upon them." *Pierce on Railroads* 143.

4. But when the private corporation is both disabled by insolvency and prohibited by injunction, from operating the railroad, and it passes into the hands of a receiver, and, by requirement of law, is operated by him "for the use of the public, subject, at all times, to the order of the Chancellor," the railroad becomes a public highway, and the receiver in charge of it, under the law and under legal direction, is a public officer, to all intents and purposes.

(1.) He was not only empowered, but also required, by the statute, "to operate said railroad."

(2.) He was required, by the statute, to operate the railroad, not for the corporation or its stockholders, nor for the benefit of the parties to the suit in which he was appointed, but for the use of the public."

(3.) He was charged, by the sovereign power of the state, with the management and operation of a public highway, "for the use of the public," that is to say, with the performance of a public duty, and, in the discharge of that duty, was required by law to act under the directions and regulations which might be made by the Chancellor.

(4.) For neglecting to operate the railroad for the public use, as required by the statute, would he not be liable to indictment?

(5.) For neglect to operate the railroad according to the orders of the Chancellor, from time to time, to which the statute required him to conform, would he not also be indictable, although at the same time amenable to the court for contempt?

(6.) What is a public officer?

(*a.*) A public officer is one who has some duty to perform, concerning the public. *Hill* v. *Boyland*, 40 *Miss.* 625.

(*b.*) Every one who is appointed to discharge a public duty, and receives a compensation, in whatever shape, whether from

the crown or otherwise, is constituted a public officer. *Henly* v. *Mayor of Lyme*, 5 *Bing*. 91.

(c.) "Every man is a public officer who hath any duty concerning the public, and he is not the less a public officer where his authority is confined to narrow limits, because it is the duty of his office and the nature of that duty, which makes him a public officer, and not the extent of his authority." *Bac. Abr.*, " *Office and Officers*," (a.)

(d.) "Commissioners appointed by the act of the legislature, to lay out and build a road for the use of the public, are public officers." *People* v. *Hayes*, 7 *How. Pr*. 248.

5. Independently of the statute in question, and on ordinary principles relating to receivers of railroads, the weight of authority is against the doctrine that a receiver is liable in a case like this.

(1.) In *Cardot* v. *Barney*, 63 *N. Y.* 281, it was held as follows :

An assignee or receiver in bankruptcy of an insolvent railroad corporation, who, as such assignee, is running and operating its road, in the absence of evidence that he assumed to act other than as assignee, or that he held himself out as a carrier of passengers other than as an officer of the court, is not liable in an action for negligence causing the death of the passenger, where no personal neglect is imputed to him, either in the selection of agents or in the performance of any duty, but where the negligence charged was that of a subordinate, whom he necessarily and properly employed, in compliance with the order of the court.

Allen, J., said : "It was urged upon us at the argument, that unless the defendant was liable, the plaintiff was remediless, and therefore the action should be sustained. But this argument cannot avail.

"It has been repeatedly said by learned judges in like cases, that it proves nothing ; and there are many instances in which individuals injured by the acts of agents, are without remedy —as in the case of injuries incurred by the acts of the employés and agents of public officers—with one or two excep-

tions, which rest upon peculiar reasons not applicable to the present action.

"Here no personal neglect is imputed to the defendant, either in the selection of agents or the performance of any duty; constructive negligence, by the act of a superintendent, necessarily and properly employed by him, is relied upon. Public officers performing their duties through the agency, and with the assistance, of subordinate agents employed by them, whether acting gratuitously or for compensation, are not answerable for the neglect or wrongful acts of their subordinates. When acting for a compensation, they are regarded as being paid for the services rendered, and not for taking the hazard of the acts of those necessarily employed by them." *Lane* v. *Cotton*, 1 *Ld. Mansf.* 646; *S. C.*, 1 *Salk.* 17; *Whitfield* v. *Ledespencer*, *Cowp.* 754; *Hall* v. *Smith*, 2 *Bing.* 156; *Duncan* v. *Findlater*, 6 *Cl. & Fin.* 894.

(2.) The case of *Klein* v. *Jewett*, 11 *C. E. Green* 474, in which Vice Chancellor Van Fleet expressed a different view, was decided without reference to, and independently of, the statute, which was not even adverted to, and was a case over which the court had no jurisdiction, the cognizance of such a case by a court of equity, having—as held by this court in *Palys* v. *Jewett*, 5 *Stew. Eq.* 317—"no footing in judicial recognition, or in any principle of practice."

Besides, the question of liability to an action was not a matter of serious dispute, the Vice Chancellor saying : "It was not seriously disputed [that] the receiver must be held liable if actionable negligence was shown."

It must be conceded, therefore, that the view of the Vice Chancellor, in regard to the liability of receivers, as expressed in that case, while it is entitled to great respect as the opinion of a learned jurist, cannot have the authority of a judicial decision. He says :

"Both upon principle and authority, I think it must be held that a receiver, operating a railroad under the order of a court of equity, stands, in respect to duty and liability, just where the corporation would, were it operating the road, and

Little v. Dusenberry.

the question whether or not the receiver is liable for negligence, must be tested by the same rules that would be applied if the corporation was the actual party defendant before the court."

(*a*.) The "principle" invoked in support of this view is stated as follows: "There can be no such thing as irresponsible power, exerting force or authority, without being subject to duty, under any system of laws framed to do justice. It is an inseparable condition of every grant of power by the state, whether expressed or not, that it shall be properly exercised, and that the grantee shall be liable for injuries resulting directly and exclusively from his negligence in its use."

If this means anything more than that public officers or corporations, clothed with authority, and charged with a duty to act for the public benefit, are liable to be punished by indictment for the abuse of that authority and the neglect of that duty, it is not a principle of law. *Freeholders of Sussex* v. *Strader,* 3 *Harr.* 108; *Cooley* v. *Freeholders of Essex,* 3 *Dutcher* 415; *Livermore* v. *Freeholders of Camden,* 5 *Id.* 245; *S. C.,* 2 *Vroom* 507; *Pray* v. *Jersey City,* 3 *Id.* 394.

(*b*.) The "authority" vouched to sustain this view consists of the three following cases: *Meara's Adm'r* v. *Holbrook,* 20 *Ohio St.* 137; *Blumenthal* v. *Brainard,* 38 *Vt.* 402; *Paige* v. *Smith,* 99 *Mass.* 395.

The case of Meara's Adm'r *v.* Holbrook was decided on the authority of Blumenthal *v.* Brainard and Paige *v.* Smith, and was influenced by a doctrine as to the liability of public officers for a private injury resulting from their neglect, which has been repudiated in this state. See New Jersey cases above cited.

The case of Blumenthal *v.* Brainard was an action on contract for the carriage of goods, and the evidence showed that the receivers conducted and held themselves out as common carriers, and the court say: "If, in fact, they were common carriers over that railroad, we think it is no defence to an action at law for a breach of duty or obligation, arising out of business entrusted to them in that relation, that they were

running and managing the line of railroad as receivers under an appointment of the Court of Chancery." The court did not intimate that, in all respects, and in the absence of any contract, a receiver would be subject to all the responsibilities of a proprietor of the road. But a suit against a receiver on his contract as a common carrier, is one thing; a suit against him as a public officer, for his neglect of a public duty, is quite another.

The case of Paige v. Smith was that of an action in Massachusetts against the same Vermont receivers, and the brief opinion of the Massachusetts court, below quoted in full, will suffice by way of explanation.

Foster, J.: "The Supreme Court of Vermont, in an action against these defendants, held that if, in fact, they were common carriers over a line of railroad, it could be no defence to an action at law, for a breach of duty or obligation arising out of business entrusted to them in that relation, that they were running and managing the line of railroad as receivers, under the appointment of the Court of Chancery. *Blumenthal* v. *Brainard*, 38 *Vt.* 408.

"It is impossible for the courts of this commonwealth to accord to these defendants an exemption from the ordinary common law liabilities of common carriers, more extensive than they are allowed in the state in which they were appointed receivers, and in which the accident occurred. Under these circumstances, the ordinary rule for which the defendants contend, that receivers are amenable solely to the court by which they are appointed, is inapplicable."

(3.) See Jones on Railroad Securities, §§ 511, 512, where the cases are reviewed, and the result is stated as follows:

"In conclusion, it seems proper to remark that, on principle, the case of *Cardot* v. *Barney* is sound; that *the doctrine of respondeat superior* as between a receiver acting under the direction of a Court of Chancery, and his employés, has no application."

6. But, as shown, the exemption of the receiver in the case at bar, does not rest alone on the ordinary principles of law

applicable to receivers, as laid down in Cardot *v.* Barney ; it rests also on the peremptory "shall" of the statute, and on the well-settled principles regulating the liabilities of public officers.

II. The interest and estate which the Central Railroad Company of New Jersey acquired by lease or agreement of October 6th, 1873, between it and the New York and Long Branch Railroad Company, in the railroad and franchises of the latter company, were, as between those companies, changed by the agreement of January 3d, 1882 ; and the third exception and assignment of error should be sustained.   See agreement of October 6th, 1873 ; agreement of January 3d, 1882.

1. This is manifest, not only from a comparison of the two documents, but also from the scope and object of the agreement of January 3d, 1882, which were to create new relations between all the parties thereto.

(1.) By the leasing agreement of 1873, the Central Railroad Company of New Jersey was 'the lessee of the New York and Long Branch railroad, with the exclusive control, use and management thereof, and bound to " keep in repair the said railroad, at its own cost."

(2.) By the quadripartite agreement of January 3d, 1882, it was agreed that the " Pennsylvania Railroad Company shall have the full, free and uninterrupted use of the said New York and Long Branch railroad, in connection with the Central Railroad Company of New Jersey and the New Jersey Southern Railroad Company;" that the trains of both the Central Railroad Company and Pennsylvania company, over the New York and Long Branch railroad, shall be "subject, as to the safety of running the same, to the approval of the superintendent of said road, and said trains, while upon said road, shall be moved under the order of its superintendent, and be subject to its rules and regulations," (§ 4, p. 102) ; and the New York and Long Branch Railroad Company was " to maintain the property between Perth Amboy and Bay Head City in first-class condition."

Little v. Dusenberry.

2. It thus appears, beyond all controversy, that, by the quadripartite agreement of 1882, the old relations of the Central Railroad Company, as lessee of the Long Branch railroad, were destroyed, and that entirely different and incompatible relations were formed between the New York and Long Branch Railroad Company with the Central Railroad Company and the Pennsylvania Railroad Company, in which neither of the two last-named companies had any estate or interest in the road, or had even the right to control its own trains on the road, in which neither paid rent, but in which the New York and Long Branch Railroad Company resumed its dominion over the road, and responsibility for the maintenance and repair thereof.

III. The Central Railroad Company of New Jersey was not, at the time the accident happened, carrying on, in its corporate capacity and for its own emolument, the transportation business over the line of the railroad in question, viz., the New York and Long Branch railroad; and the fourth exception and assignment of error should be sustained.

The Central Railroad Company of New Jersey, when this accident happened, was not carrying on, but was enjoined from carrying on, any business whatever. The powers of the corporation were suspended, and its railroad was operated by the receiver not for the emolument of the company, but "for the use of the public."

IV. The said Cephas M. Woodruff did not buy a ticket issued by the said Central Railroad Company of New Jersey, and the ticket did not purport to be a contract of that company to carry him, and neither in that way nor in any other way was the relation of passenger and carrier created between him and the last-named company; and the fifth exception and assignment of error should therefore be sustained.

1. The evidence clearly shows that the ticket was issued and sold to the deceased, not by the Central Railroad Com-

pany, but by the New York and Long Branch Railroad Company, through its ticket-agent (Mr. Jorolamon), at Asbury Park. Although the ticket was originally prepared by the Central Railroad Company while lessee of the New York and Long Branch railroad, with the intention of issuing it for a passage on that road, yet it never, in fact, was issued for that purpose, but (with others) was sold to the New York and Long Branch Railroad Company, after the quadripartite agreement of 1882, and issued by the latter company on its own account.

2. The ticket did not purport to be a contract of the Central Raiload Company to carry the deceased.

(1.) It is true that the ticket, because originally intended for use by the Central Railroad Company, as lessee, has printed on it the name, "Central Railroad of New Jersey," but with the words, "New York and Long Branch Division" super-added; the whole purport of which was that it related to the New York and Long Branch railroad.

(2.) The ticket was not a contract, and did not purport to be a contract, by or with any one or for any purpose.

(3.) It was "a mere receipt, token or voucher, adopted for convenience, to show that the passenger has paid his fare from one place to another." See *Thompson on Carriers* 65, 431, 432; *Hutchinson on Carriers*, § 580; *Quimby* v. *Vanderbilt*, 17 *N. Y.* 306; *S. C., Thompson on Carriers* 423; *State* v. *Overton*, 4 *Zab.* 435, 438.

V. There was error in the instruction to the jury that if they should find that the track at the switch where the accident happened was in an unsafe condition, through the negligence of those engaged in putting the switch in, the said defendant might be held liable in damages in this suit; and the sixth exception and assignment of error should therefore be sustained.

1. "Those engaged in putting the switch in" were "in the employ of the superintendent of the New York and Long Branch Railroad Company." The learned judge so charged.

2. Under the agreement of 1882, the New York and Long Branch Railroad Company alone was bound to maintain and keep in repair the road.

3. As the contract was made with the New York and Long Branch Railroad Company, which alone undertook to carry the deceased, so the duty of carrying him safely rested only on that company. The action, although in tort, is founded on "a duty arising out of a contract." *Thompson on Carriers* 65, *n.* 6.

4. The fact that the train of cars was owned by the Central Railroad Company is of no consequence, because:

(1.) No person or corporation can be held liable merely by reason of ownership of a vehicle in which one rides when he meets with an accident.

(2.) It is undeniable that the accident arose not from a defect in the cars or engine, or negligence of those in charge of the train, but from a defect in the road, or neglect of the employés of the New York and Long Branch Railroad Company.

(3.) The New York and Long Branch railroad was not under the control of the receiver, but exclusively under the control of the New York and Long Branch Railroad Company, its owner. See under "Second Point," *supra.*

(4.) Under the provisions of the agreement of 1882, and as a matter of fact undisputed, all the trains and train employés were under the absolute control and regulation of the New York and Long Branch Railroad Company and its superintendent, "while upon said road." See agreement of 1882, §§ 4, 16.

(5.) As the undertaking to carry was not entered into by the receiver, and as neither the road, the train nor the train hands were under his control, it follows that no negligence, and therefore no liability, could be imputed to him.

For the defendant in error, *H. C. Pitney.*

I. The proof was abundant and clear that the relation of passenger and carrier existed between the parties.

Defendant was riding in a train owned and controlled by the receiver, run by an engineer and conductor in his employ, upon a ticket issued by the receiver, and upon a track of which the Central Railroad Company was lessee in possession.

The New York and Long Branch Railroad Company owned no cars and ran no trains.

II. The contract between the Central and Pennsylvania Railroad Companies did not alter the position of the Central company, as lessee in possession of the New York and Long Branch railroad. It merely provided for a joint use of the road.

But it is immaterial whether defendant was in actual possession and control as lessee or not, for—

III. Admitting that the *quasi* possession and control of the New York and Long Branch railroad was, by the contract, restored to the New York and Long Branch Railroad Company, yet such possession and control of its track did not relieve the Central railroad from its liability for any negligence in keeping the track in order.

The rule is that the carrier is a warrantor against any negligence in the construction and daily maintenance of every appliance necessary to insure the passengers' safety.

He is not a warrantor against all defects, but he is a warrantor against all defects which are the result of negligence, either in original construction or subsequent maintenance.

At one time, it was held that the carrier was an absolute guarantor against all defects. *Alden* v. *N. Y. Central R. R. Co.*, 26 *N. Y.* 102.

The question first arose in cases of defects in construction of vehicles. *Sharp* v. *Grey*, 9 *Bing.* 457, 459; *Grote* v. *R. R. Co.*, 2 *W. H. & G. Ex.* 251, 255.

The leading case on the present point is *Blake* v. *Great Western R. W. Co.*, 7 *H. & N.* 986, in Exchequer Chamber, before Cockburn, C. J., Wightman, Crompton, Byles, Keating and Mellor, JJ.

Plaintiff bought of defendant, in London, a ticket for a journey from London to Milford. Defendant's line extended to Gloucester, and thence it ran over the South Wales railway, under a contract with that company, by which the fares paid by passengers were apportioned between the two companies. The South Wales company left an engine standing on its track, thereby causing a collision with defendant's train, on which plaintiff was riding, whereby he was injured. No negligence was imputed to the defendant, but it was held liable for the negligence of the other company.

Chief Justice Cockburn (p. 992) says : "If a railway company chooses to contract to carry passengers, not only over their own line, but also over the line of another company, the company so contracting incurs all the liability which would attach to them if they had contracted solely to carry over their own line.   *   *   *   Under these circumstances, the Great Western Railroad Company became responsible for the safety of every passenger throughout the distance for which they gave him a ticket, just as if they had conveyed him over their own line.   *   *   *   If, by arrangement with another company, they convey passengers over the whole or part of another line, the same obligation attaches, and they make the other company their agent, and on their part, they undertake that the other company shall keep their line in proper condition.   It is unnecessary to say whether the plaintiff below would have had a right of action against the South Wales company; at all events, he has against the Great Western company.   It would be inconsistent with public safety and convenience to put any other construction on such a contract than that the Great Western Railway Company should be primarily liable to the plaintiff below, and should take their remedy against the South Wales company, whose servants, by their negligence, have caused the accident."

Crompton, J., said : "The Great Western Railway Company having made arrangements with the South Wales Company for the carriage of passengers to Milford, and for dividing the

fares between them, one of the responsibilities which they took upon themselves was, that the line should be safe and secure the whole distance."

The other judges said the effect of the arrangement was to make the line of the South Wales company, *pro hac vice*, the line of the Great Western Railway Company. This is the leading English case where the defendant sought to be charged had running powers, by contract, over the line of the third party.

It was followed by *Buxton* v. *North Eastern Railway Co.*, *L. R.*, 3 *Q. B.* 549. The plaintiff was a passenger on a train of cars run by the defendant from York to Tamworth, a town on the Midland company's road. When on the Midland company's road, the train came in collision with a bullock which had strayed on to the track from an adjoining field, breaking down a fence which had become defective through age, and which it was the duty of the Midland company to keep in repair. The plaintiff, being injured by the collision, sought to recover damages from the defendant. *Held*, that the defendant was liable on the authority of Blake's case. Lush, J., went out of his way to approve of that decision.

Then comes *John* v. *Bacon*, *L. R.*, 5 *C. P.* 437. Plaintiff was a passenger from Milford Haven to Liverpool, on a steamer of defendant, running from Havenford to Liverpool and stopping at Milford Haven. At the latter place, passengers boarded the steamer by means of a hulk belonging to a third party, and used as a sort of wharf.

In passing through the hulk, plaintiff fell through an open hatchway, in the dark, and was injured. Defendant had a contract with the owner of the hulk to make use of it for embarking and disembarking passengers.

Defendant was held liable on the authority of Blake's case, Buxton's case, and Francis v. Cockrell, per Bovill, Keating, Montague Smith, and Brett, JJ., and all expressed approbation of those cases.

*Francis* v. *Cockrell*, *L. R.*, 5 *Q. B.* 184, 501, on appeal

(head-note in Queen's Bench): "Where a man causes a building to be erected for viewing a public exhibition, and admits persons on payment of money, the contract between him and the persons admitted is analogous to the contract between a carrier and his passengers; and there is implied in such contract a warranty not only of due care on the part of himself and servants, but also of due care on the part of any independent contractor who may have been employed by him to construct the means of conveyance or support.

"Where, therefore, the defendant, acting on behalf of himself and others interested in certain races, entered into a contract with E., who was a competent person to be so employed, to erect and let to them a grand stand for the purpose of viewing the races, and the defendant, on behalf of himself and his colleagues, received five shillings (to be appropriated to the race fund) from every person admitted, of whom the plaintiff was one, and the stand had been negligently and improperly constructed (but not to the knowledge of the defendant), and, in consequence, fell and injured the plaintiff —*Held*, plaintiff could maintain an action against the defendant for the damages sustained, although the defendant was free from all negligence and had employed a competent person to erect the stand."

And see language of Hannen, J., at p. 193, cited at length in *Hutchinson on Carriers*, § 512.

On appeal, (*L. R.*, 5 *Q. B.* 501,) the head-note is varied thus:

"A man who causes a building to be erected for viewing a public exhibition, and admits persons on payment of money to a seat in the building, impliedly undertakes that due care has been exercised in the erection and that the building is reasonably fit for the purpose."

And then follow the remaining head-notes used in the report in the court below.

The judgment of the Q. B. was unanimously affirmed, receiving the votes of Kelly, C. B., Martin, B., Channell, B., Keating, J., Montague Smith, J., and Cleasby, B. The

judges relied upon Readhead's case, Sharp *v.* Grey, Burn's case in Ireland, and Grote's case; and the reasoning of Kelly, C. B., (p. 505) includes the road-bed as well as the carriage of the railway. His explanation of *Grote* v. *Railway*, 2 *Ex.* 251, is important.

Next comes *Thomas* v. *Rhymney Railway Co., L. R.,* 5 *Q. B.* 226; *L. R.,* 6 *Q. B.* 266, on appeal, which is the leading case where the defendant sought to be charged had running powers over another road by virtue of an act of parliament.

Plaintiff purchased a ticket from defendant to ride from Caerphilly to Cardiff. At Llandaff, defendant's line joins the Taff Vale Railway Company's road, and thence to Cardiff the train ran over that road by virtue of running powers granted by a special act of parliament. The whole of the traffic arrangements, &c., over the Taff Vale road were left, by the act of parliament, in the control of the Taff Vale company.

The plaintiff's train collided with the rear of a train of the Taff Vale company, wholly through the neglect of the latter company. Its signal man had permitted defendant's train to pass on to that road too soon after the other train had started. The plaintiff was injured by the collision. *Held,* by the Queen's Bench, per Mellor, Lush and Hannen, JJ., on the authority of Blake's and Buxton's cases, that the defendant was liable.

In Exchequer Chamber, where the facts are more fully stated, the case was elaborately argued before Kelly, Bramwell, Channell, Keating, Montague Smith, Brett and Cleasby, seven judges; and the distinction between it and Blake's case was pointed out, viz., that in one, the running was by virtue of a contract and apportioning of the fares, and, in the other, by act of parliament and payment of tolls. All concurred in affirming the judgment, six of them on principle as well as authority, and one—Bramwell—on authority alone.

Kelly, C. B., said (p. 272): "We are of opinion, both upon principle and authority, that the company, by the granting of that ticket, entered into a contract that due and reason-

able care should be taken that the plaintiff should be conveyed·
in safety upon the entire journey." And again: "I am still
of the opinion, upon every principle of law, justice and reason,
when a ticket is issued at Euston Square station for the con-
veyance of a passenger to Edinburgh, for still further north,
where the traveler may, in the course of his journey, have to·
pass over several lines of railway belonging to different com-
panies, that the contract which was entered into by the
company that issues the ticket is a contract that reasonable
care shall be exercised by all by whom exercise of care is
necessary for the reasonably safe conveyance of the passenger·
from one end of the journey to the other. * * * It cer-
tainly appears to me to make no more difference that they are
enabled to carry the passengers along a portion of the line
under some arrangement with another company, than if it
were their own line and a portion of it were kept in repair
under a contract with some persons who were in the habit,.
for a due consideration, of effecting repairs for railroad com-
panies; which certainly would not exempt the company from
the obligations imposed upon it."

In the latter case of *Wright* v. *Midland Railway Co., L. R.,*
8 *Exch.* 137, the doctrine of the earlier cases was re-affirmed,
but confined within the true *ratio decidendi* of those cases, and
the decision was against the plaintiff on the facts of that case.
Plaintiff was a passenger over defendant's own road, in its own
train. Another railway company, viz., the London and North
Western, had running power over it by act of parliament, and
a train of the latter, which got in the way of defendant's train
by running in disobedience and disregard to defendant's sig-
nals, ran into it and injured plaintiff. The jury acquitted
defendant of all negligence, and attributed the accident wholly
to the negligence of the London and North Western company,.
in disobeying defendant's signals.

The case was distinguished from Thomas' case on the
ground that in that case the defendant, the Rhymney Railway
Company, trusted to the signals of the servants of the Taff
Vale road, when they might have provided their own men.

to watch and give signals; and from Blake's case on the ground that the obstruction there was within the power, and therefore within the duty, of the defendant to have guarded against; while in Wright's case the defendant did all in its power to prevent the collision by signaling, &c. Cleasby, B., in delivering judgment, said (p. 144): "I quite agree that a contract for carriage from one place to another extends over the whole journey, whether upon the line of the contracting · company or not, and, further, that it is the carrier's duty to use due and reasonable care during the whole journey. And I think that due and reasonable care extends to everything that is made use of by the contracting party during the course of that journey. For instance, as regards the construction of a railway, it embraces a contract that the rails themselves shall be in a sound and efficient state, so far as due care can make them so, and if they were worn out on a part of the railway not belonging to the contracting company, and which, therefore, they had not the power to repair, I agree that the decisions would establish that they would be liable for a want of care in those rails not being in a proper state if any damage was sustained thereby; and the same may be said if the switches or anything of that sort were defectively constructed, and it were made out that in the course of a journey over the rails an accident arose from that defective construction."

It is worthy of remark that the Supreme Court of the United States, in *Railroad Co.* v. *Barron*, 5 *Wall.* 90, a case almost exactly parallel with Wright *v.* Midland Railroad, held the defendant liable, affirming the Circuit Court in Illinois.

The rule laid down in these English cases is recognized as sound by Mr. Hutchinson (§ 514), and he cites numerous American cases to the same effect, of which I will mention two.

In *McElroy* v. *Nashua and Lowell Railroad Co.*, 4 *Cush.* 400, the accident was caused by the carelessness of a switchman of the Concord railroad in managing a switch, by which the Concord road was connected with the defendant's road.

This connection was made by virtue of power reserved by the legislature in the original charter of defendant, so that the Concord road had the right *in invitum* the defendant, to make such connection, and did make it accordingly.

The court, per Shaw, C. J., held the defendant liable for the negligence of the switchman of the Concord road, saying "that it was within the scope of defendant's duty to see that the switch was rightly constructed, attended and managed, before they were justified in carrying passengers over it."

*Roy* v. *Penna. Co.*, 102 *U. S.* 451, goes on the same principle. There the court held the defendant liable for the negligence of the conductor and porter of a sleeping-car owned and managed by an independent palace-car company, which collected for its own use the charge for the sleeping-car ticket, which was over and above the regular fare charged by the defendant for a seat in an ordinary car.

Mr. Justice Harlan (p. 457) lays down the principle governing the case in terms which include the case of the use of a railroad line owned by another company. He says that the defendant should not have permitted the sleeping-cars to be used on its road without reserving and exercising the right of inspection in order to insure the safety of its passengers, and further, that the servants of the palace-car company must be held in law to be the servants of the railroad company, the defendant.

These two cases give the key-note of the doctrine.

A railroad company is never obliged to run its cars over the track of another company. Its doing so is always a matter of choice on its part. It takes its train over the foreign line voluntarily. Before going over the foreign road it should take care to make arrangements for the opportunity to provide by its own servants for the care and maintenance of the track of that road. It need not trust the servants of the other line to do that—it may insist on doing it itself; and if it do trust the other company's servants, it thereby makes them its own servants and becomes responsible for their negligence in the performance of that service.

The same principle, substantially, was applied in *Salmon v. Railroad*, 10 *Vroom* 299 (¶ 5 of head-note), approving *Richardson* v. *Railroad, L. R.*, 10 *C. P.* 486, and declaring the liability of the defendant for the negligence of another railroad company running an engine on defendant's track by statutory power.

In order to fix upon the defendants herein a liability for the accident in this case, it is not necessary to go so far as the English cases go.

If the accident was caused by the imperfect arrangement of the switch, there was ample opportunity for defendant to have inspected and ascertained whether the work was perfect and the track fit for use. The actual work of placing the switch was done on the previous day, in full sight of passing trains.

Defendant had notice of it, and, in the language of Shaw, C. J., was not justified in conveying passengers over it until he knew it was in a fit condition for that purpose.

The train which was wrecked was drawn by an extraordinarily heavy engine and ran at an extraordinary rate of speed, and the jury were justified in finding that it was negligence to run such a train with such speed over a newly-made switch, without first making special inspection by a servant of the defendant, to see if it was rightly constructed.

IV. The defendant is not exempt from liability by reason of his being an officer of the Court of Chancery.

For the purposes of this suit he is a mere figure-head—a bare trustee. The real defendant is the railroad company. The judgment is to be paid, by permission of the Chancellor, out of its funds.

His position is quite distinct from that of a municipality.

The functions of a receiver of a railroad company are precisely those of a receiver of a manufacturing corporation, and the mere fact that he carries on a business for profit, which is of a *quasi* public nature, does not alter the case.

The language of the Supreme Court, in *State* v. *Railroad Commissioners*, 12 *Vroom* 235, 239, is apposite. And the cases

of *Klein* v. *Jewett,* 11 *C. E. Green* 474; *S. C., on appeal,* 12 *C. E. Green* 550; *Palys* v. *Jewett,* 5 *Stew. Eq.* 302, are in point.

There was, indeed, no attempt in either of those cases to invoke the doctrine of *Freeholders* v. *Strader,* 3 *Harr.* 108, and *Pray* v. *Mayor,* 3 *Vroom* 394, but we may be sure the omission was not the result of oversight on the part of the very distinguished counsel in the later cases. But admitting the defendant herein occupies a position and exercises functions of a public character, so as to give him the benefit of the doctrine of the freeholder cases, and that Klein *v.* Jewett and Palys *v.* Jewett would have been decided the other way if the point had been taken, still, that doctrine does not help defendant.

It is thus stated (3 *Harr.* 108): "Where a corporate body, whether of a municipal or of a private character, owes a specific duty to an individual, an action will lie for a breach or neglect of that duty, whenever such breach or neglect has occasioned an injury to that individual; but if such corporation owe a duty to the public, a neglect to perform it, although every individual composing that public is injured, some more and some less, yet they can have no private remedy at the common law."

And this head-note is taken from Chief Justice Hornblower's opinion, p. 121.

And in *Livermore* v. *Freeholders,* 5 *Dutcher* 245, it is again stated (p. 246) as follows:

"This court held, in *Freeholders of Sussex* v. *Strader,* 3 *Harr.* 108, that no action lies at the suit of an individual against the board of chosen freeholders of a county for injuries sustained in consequence of their not completing or keeping in repair a county bridge or its abutments; that the only remedy was by indictment. This principle was re-affirmed by this court in *Cooley* v. *Chosen Freeholders of Essex,* 3 *Dutcher* 415. See, also, *State* v. *Chosen Freeholders of Essex,* 3 *Zab.* 214, in which it was held that it rested in the discretion of

the board whether to rebuild a bridge or not, that the location might be changed.

"The ground upon which these decisions first cited rest, is that the duty is owed to the public, and not to each individual who may have occasion to use the bridge, and that the adoption of any other rule would be highly inexpedient and destructive of the public interests, by subjecting these public corporations to numberless suits for every petty neglect occasioning inconvenience to any one."

Now, the " duty to the public " there spoken of is one not arising out of contract with any individual, but one which is due to the public as such, and which, if neglected, subjects the municipality to punishment, whether any injury to any individual arises or not.

There was, in those cases, no contract with the party who was injured, nor any duty owing to him over and above every other person in the community.

But here, by reason of the contract entered into between the deceased and the defendant, a specific duty arose and was owing from the defendant to the deceased, and to each other passenger on the train severally, and to no other person in the world. Had the deceased been the only passenger, the duty would have been owed to him alone. Had there been no passengers, there would have been no duty to anybody. The public at large had no interest in the question.

The case is far within Klein v. Jewett and Palys v. Jewett, where the relation of passenger and carrier did not exist.

It is not perceived how the act of February 11th, 1874, (Rev., p. 196,) alters the case. The trustee, in operating the railroad under it, does it in the ordinary way, by making contracts with passengers to carry them from place to place. He is in no degree relieved thereby from the ordinary obligations of a common carrier. The question—if there be any— whether the damages herein recovered must be paid, if at all, out of the receipts of the road, is not involved in the present discussion.

It is worthy of remark that the rule in Strader v. Free-

holders, so far as it exempted municipalities from liability to action, has been modified by the legislature. *Act of March 23d,* 1859, §§ 20, 21, *Rev., p.* 1017, ¶¶ 120, 121 ; *Act of March* 15*th,* 1860, *Rev., p.* 86, ¶ 9.

The opinion of the court was delivered by

SCUDDER, J.   The first error assigned on the bill of exceptions returned with the writ is that the receiver was not liable to this action because that under his statutory appointment he is not a common carrier, but a public officer.

This statute of February 11th, 1874, enacts " that whenever any incorporated railroad company in this state shall become insolvent, and the property of such company shall have passed into the hands of a receiver by order of the Chancellor, in accordance with the act to which this is a supplement, the receiver shall, and he is hereby empowered to, operate said railroad for the use of the public, subject, at all times, to the order of the Chancellor ; and all expenses incident to the operation of said railroad shall be a first lien on the receipts, to be paid before any other encumbrance whatever." *Rev., p.* 196, § 106.

It is urged that as he was empowered by the act to operate the railroad for the use of the public, there can be no liability to individuals on his part when executing this public duty. *Freeholders* v. *Strader,* 3 *Harr.* 108 ; *Cooley* v. *Freeholders,* 3 *Dutcher* 415 ; *Livermore* v. *Freeholders,* 5 *Dutcher* 245 ; *S. C.,* 2 *Vroom* 507 ; *Pray* v. *Jersey City,* 3 *Vroom* 394 ; *Marvin Safe Co.* v. *Ward, ante pp.* 19–21, are cited in support of this position.   The exhaustive view of this disputed principle in *Hill* v. *Boston,* 122 *Mass.* 344, defines its true application in protecting those who are acting under public authority. It agrees with the statement in the conclusion of the opinion of the court in *Pray* v. Jersey City, in these words : " The neglects of agents of the public in the discharge of their legitimate functions cannot constitute the basis of an action in behalf of an individual who has sustained a particular damage.   Such neglects are public offences, and must be remedied

by indictment." Taking this as the settled law of our state,. the first inquiry is, Does this defendant—the receiver of an insolvent railroad company—stand in such position to the public that he can claim its protection?

An examination of the cases where this immunity has been given, will show that it is limited to those who are strictly public officers, who are parts of the governmental agency of the state, entirely distinct from individual gain or profit, such as state, county, municipal and township boards and officers, discharging duties imposed on them by law, with none behind them but the public, whom they represent, and no funds to answer for damages except those that must be taken from' the public treasury. The phrase in the statute, "to operate said railroad for the use of the public," does not create this public office. It imposes on the receiver appointed by the Chancellor no other duty to the public than that which belongs to every railroad corporation acting under stautory authority. They must operate their railroads for the use of the public, and do so, otherwise they could have no legal right of eminent domain to condemn lands and materials for the construction and maintenance of their roads. The object of the statute is plain, that when a railroad company becomes insolvent, it shall and may be kept in operation for the public convenience of travel and. transportation. If its operation should immediately cease when its insolvency is determined, great detriment would follow to those who are dependent on it as a highway open for the use of all who may need it. At the trial in the Circuit, the judge, in charging the jury, said that the statute " was simply designed to secure the running of the road in the interest of the public, by making the running expenses the first lien on the receipts, in priority over encumbrances." This is the obvious meaning, and there was no intention on the part of the legislature to create a new public office, and clothe the receiver who occupied it by the appointment of the court, with the immunities of such office, and thereby enable him to shield himself, cover up the earnings and protect the stockholders and creditors from damages to·

others, in operating the road. It has been the judicial construction of this statute, in our courts, that it does not change the obligation of the receiver, who, by the appointment of the Chancellor, takes upon him the management of the road, and that he is liable, in his representative capacity, in all respects, to others, for injuries, as the company would be, if transacting its business in the usual way.

*Klein* v. *Jewett*, 11 *C. E. Green* 474, decided that there was such liability of the receiver, and, on appeal to this court, in the same case, 12 *C. E. Green* 550, this point appears to have been abandoned.

*Palys* v. *Jewett*, 5 *Stew. Eq.* 302, was an action against the defendant, as the receiver of the Erie railway, for damages alleged to have been sustained by the plaintiff by reason of the negligence of the employés of the receiver, in the management of a train of cars, and it ruled that a person having a legal cause of action, sounding merely in tort, against the receiver appointed by the Court of Chancery, has a right to pursue his redress by an action of law, with the permission of the Chancellor. In the first-named case, *Meara* v. *Holbrook*, 20 *Ohio St.* 137; *Blumenthal* v. *Brainard*, 38 *Vt.* 402; *Paige* v. *Smith*, 99 *Mass.* 395, are cited with approval. In all, receivers are held to their liability as common carriers, for a breach of duty or obligation arising out of business entrusted to them in that relation, and it is no defence at law that they were running and managing the line of railroad as receivers, under the appointment of the Court of Chancery. It is said in *Jones on Railroad Securities*, ¶ 509, that there is much diversity of opinion upon the question whether a receiver is liable for the negligence of his employés in the same manner and to the same extent that a railroad company, operating its road, is liable. After citing and balancing the cases in different courts, he concludes that the doctrine of *respondeat superior*, as between a receiver acting under the direction of a Court of Chancery, and his employés, has no application. If this be confined to the principle that a receiver is not personally responsible for injuries suffered by

the neglect or misconduct of persons employed by him in performing his duties under the appointment of court, there will probably be no difference of opinion, but if he is not held liable, in his representative capacity, for the negligence of his employés, and in no way responsible for their misconduct, a very serious difficulty is presented, for it thus appears there may be a right, where there is no remedy to enforce it. But the author further says : " Considerations of policy may very likely lead to the adoption of the rule that a receiver shall not be allowed to exercise the rights and powers of a common carrier, without also being held subject to a common carrier's duties and liabilities."

*Cardot* v. *Barney*, 63 *N. Y.* 281, holds that an assignee or receiver in bankruptcy of an insolvent corporation is not liable to an action for the negligence of employés, unless he assumes to act as a common carrier, other than as an officer of the court, or where personal neglect is imputed to him. ·

Danforth, J., in *Kain* v. *Smith*, 80 *N. Y.* 458, 470, remarking on the case of Cardot *v.* Barney, says : " Observe the care with which the facts are eliminated on which it rests ; but, as if to prevent any misconception, the learned judge confines it to a case where there is an absence of evidence that the operator assumed to act otherwise than as an assignee, or that he held himself out as a carrier of passengers · other than as an officer of the court. So limited, there is no danger that any injury will go without compensation. Damages for injury to the person, whether passenger or employé, for loss of goods or otherwise, would be chargeable upon and payable out of the fund in court, the same as other expenses of administration ;" and this may be reached, he says, by application to the same tribunal which might, itself, dispose of the matter by administering justice between the parties or allow the party aggrieved to bring his suit at law for the alleged injury. He cites Klein *v.* Jewett as authority. The case turned on other facts, which it is not necessary to state.

The examination of these cases does not show so great a divergence of authority as has been supposed, for it is not

contended in this case, nor has it ever been held in our courts, that the fund in the hands of the court, or of the receiver as its officer, can be reached without the leave of the Court of Chancery, or that an action can be brought at law to fix the measure of damages sustained, without such leave. After judgment obtained at law, the execution will be stayed by injunction or by motion in the court having control of the process.

*Barton* v. *Barbour*, 104 *U. S.* 126, which discusses this subject very fully, concludes, on the facts there involved, that a court of equity, having in its hands for administration, as trust assets, a railroad or other property, may authorize the receiver to keep it in repair, and manage it in the ordinary way, until it can be sold to the best advantage of all interested therein. But, without leave of that court, a court of another state has, under the circumstances, no jurisdiction to entertain suits against him for causes of action arising in the state wherein he was appointed and where the property is situated, which are based on his negligence or that of his servants, in the performance of their duty, in respect to the property. The plea in that case averred that the plaintiff had not obtained leave of the court having custody of the railroad assets, to bring and maintain his suit. It was on demurrer to the plea which admitted that the suit was brought without leave, that the case was considered. If such leave had been obtained before action brought, a different case would have been presented.

*Fallow, Receiver,* v. *Kelly,* 108 *U. S.* 288, in which an action was brought against a receiver of a railroad corporation, to recover damages against him, as common carrier, for injuries suffered by a collision of the car in which the plaintiff was riding, with a freight car standing on a side track, shows that Kelly, the plaintiff, petitioned the court which appointed the receiver, for leave to sue him in another court, to recover for injuries sustained. This was denied, and he asked leave to file his complaint against the receiver, in a suit for the foreclosure of a mortgage, in which the receiver was appointed.

This was granted, and the receiver ordered to make his defence, which was found against him.

It can hardly be said, as the result of an examination of these cases, and many others referred to in them, that it is settled law that a receiver of an insolvent railroad corporation may not be sued at law, where, as in this case, he is continuing the business of the company, as a common carrier, for the transportation of passengers and freight, for hire, and where the defence is not set up, that the action is brought without leave of the court that appointed him.   On the contrary, it appears that, with such leave, he may be sued at law, and that it accords with sound principle and reason that a receiver exercising the franchise of a railroad company shall be held amenable, in his official capacity, to the same rules of liability that are applicable to the company while it exercises the same powers of operating the road.   *Sprague* v. *Smith*, 29 *Vt.* 421. I do not find in the case returned the specific exception taken that leave was not granted to bring the action.   If this be so, it will be assumed, after verdict in a court having general common law jurisdiction, that whatever was necessary to sustain the case stated in the declaration, was proved on the trial, and that such leave was granted.   *Stenne* v. *Hogg*, 1 *Wm. Saund.* 228 ; *Steph. Pl.* *148.

There was no error in the charge to the jury that the receiver, in his representative capacity, was liable for injuries resulting from the transaction of the business of the corporation under his supervision, as such receiver, the same as the corporation which he represented.   If a receiver may thus be charged, the remaining exceptions relate to the particular facts of this case, which, it is objected, do not show him to be chargeable.   There was no doubt, under the evidence, that the decedent, Cephas M. Woodruff, bought an ordinary railroad ticket at the Ocean Grove depot, which was issued from the office in New York, by the general passenger agent, and sent to the office at Ocean Grove for sale.   It was entitled "Central Railroad of New Jersey, New York and Long Branch Division ;" signed by "H. P. Baldwin," who was the

general agent; endorsed with the initials of the company, "Jun. 29th, 1882, Ocean Grove;" and on the margin, "Good for one passage, this day and train only." In the body of the ticket was printed, "New York." On the face of the ticket and by the testimony, this was a through ticket from Ocean Grove to New York. This ticket was an undertaking by the Central Railroad Company, acting by its receiver, to carry the decedent, upon which he entered its train and took passage, whereby the relation of passenger and carrier was created between them. The duty imposed on the company and its agents was such as attaches to all carriers of passengers on railroads; they were bound to use proper care and skill in everything that concerned the safety of passengers, and to exercise diligence, in that respect, in proportion to the hazards and dangers likely to be encountered, and became liable for the consequences that might follow the neglect of such care, skill and diligence. This includes all the equipments of the train—the road-bed, bridges, rails, switches and signals which are commonly used in operating a railroad; also, the handling of the train by persons of competent skill and carefulness. All were comprehended in the undertaking of the railroad company, acting through its receiver and agents.

But it is said this liability was limited by the particular position of this company, as lessee of the railroad, under the New York and Long Branch Railroad Company, dated October 6th, 1873, and by an agreement of January 3d, 1882, which gave the Pennsylvania Railroad Company the use of the New York and Long Branch railroad, in common with the Central Railroad Company and the New Jersey Southern Railroad Company, and whereby the Central Railroad Company, " so controlling the New York and Long Branch Railroad Company," guaranteed to the Pennsylvania Railroad Company such use of the New York and Long Branch railroad. It is clear that, by the lease and agreement, the Central Railroad Company, by its receiver, was authorized " to furnish and run the train service required for its own business upon the line," and was actually running it when this passen-

Little v. Dusenberry.

·ger held its ticket for carriage to New York. Whatever changes were made in the latter agreement affecting the management, construction and maintenance of the road, between the parties to it, they were immaterial to this plaintiff, whose intestate principal was no party to its terms. The decedent, whom he represents, had no notice of it, and was not bound or limited by its provisions. This action, although in tort for the negligence of the defendant, is founded on the duty arising out of the agreement with the passenger, by which the company had undertaken that due care for his safety should be used during the whole course of his journey, not only in the construction and management of the train, but in the maintenance of the whole line from Ocean Grove to New York, in a condition fit for his passage over it. This undertaking is not changed by the fact that, in the journey, the passenger was to be taken over other companies' roads, and that, by arrangement between them, the lines were worked and the fares paid by passengers apportioned between them. *Great Western R. W. Co.* v. *Blake,* 7 *H. & N.* 986; *John* v. *Bacon, L. R.,* 5 *C. P.* 437; *Pierce on Railroads* 282; *Railroad Co.* v. *Barron,* 5 *Wall.* 90; *Penna. R. R. Co.* v. *Roy,* 102 *U. S.* 451.

This covers all the assignments of error in the case presented, and the judgment will be affirmed.

*For affirmance* — THE CHANCELLOR, CHIEF JUSTICE, DIXON, KNAPP, PARKER, REED, SCUDDER, VAN SYCKEL, BROWN, CLEMENT, COLE, PATERSON, WHITAKER. 13.

*For reversal* — None.